5 A.3d 586 (2010)
VERSATA ENTERPRISES, INC. and Trilogy, Inc., Defendants/Counter-claim Plaintiffs Below, Appellants/Cross Appellees,
v.
SELECTICA, INC., Plaintiff Below, Appellee/Cross Appellant, and
Selectica, Inc., James Arnold, Alan B. Howe, Lloyd Sems, Jim Thanos, and Brenda Zawatski, Counterclaim Defendants Below, Appellees/Cross Appellants.
No. 193, 2010.
Supreme Court of Delaware.
Submitted: July 7, 2010.
Decided: October 4, 2010.
*588 Megan Ward Cascio, Esquire, Leslie A. Polizoti, Esquire and Ryan D. Stottmann, Esquire, Morris, Nichols Arsht & Tunnell, LLP, Wilmington, Delaware, and Nicholas Even, Esquire (argued) and Daniel Gold, Esquire, Haynes and Boone, LLP, Dallas, Texas, for appellants.
Gregory V. Varallo, Esquire (argued), Lisa A. Schmidt, Esquire, John D. Hendershot, Esquire, Ethan A. Shaner, Esquire, Scott W. Perkins, Esquire and Jillian G. Remming, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, and Jonathan S. Kitchen, Esquire and Christian H. Cebrian, Esquire, Cox, Castle & Nicholson, LLP, San Francisco, California, for Selectica, Inc., James Arnold, Alan B. Howe, Lloyd Sems, James Thanos and Brenda Zawatski.
Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.
HOLLAND, Justice:
This is an appeal from a final judgment entered by the Court of Chancery. On November 16, 2008 the Board of Directors of Selectica, Inc. ("Selectica") reduced the trigger of its "poison pill" Shareholder Rights Plan from 15% to 4.99% of Selectica's outstanding shares and capped existing shareholders who held a 5% or more interest to a further increase of only 0.5% (the "NOL Poison Pill"). Selectica's reason for taking such action was to protect the company's net operating loss carryforwards ("NOLs"). When Trilogy, Inc. ("Trilogy") subsequently purchased shares above this cap, Selectica filed suit in the Court of Chancery on December 21, 2008, seeking a declaration that the NOL Poison Pill was valid and enforceable. On January 2, 2009, Selectica implemented the dilutive exchange provision (the "Exchange") of the NOL Poison Pill, which reduced Trilogy's interest from 6.7% to 3.3%, and adopted another Rights Plan with a 4.99% trigger (the "Reloaded NOL Poison Pill"). Selectica then amended its complaint to seek a declaration that the Exchange and the Reloaded NOL Poison Pill were valid.
Trilogy and its subsidiary Versata Enterprises, Inc. ("Versata") counterclaimed that the NOL Poison Pill, the Reloaded NOL Poison Pill, and the Exchange were unlawful on the grounds that, before acting, the Board failed to consider that its NOLs were unusable or that the two NOL poison pills were unnecessary given Selectica's unbroken history of losses and doubtful prospects of annual profits. Trilogy and Versata also asserted that the NOL Poison Pill and the Reloaded NOL Poison Pill were impermissibly preclusive of a successful proxy contest for Board control, particularly when combined with Selectica's staggered director terms. After trial, the Court of Chancery held that the NOL Poison Pill, the Reloaded NOL Poison Pill, and the Exchange were all valid under Delaware law.
Trilogy and Versata now appeal and assert two claims of error. First, they contend that the Court of Chancery erred in applying the Unocal test for enhanced judicial scrutiny when confronting what they frame as a question of first impression. The issue (as framed by them) is: "what are the minimum requirements for a reasonable investigation before the board of a never-profitable company may adopt a [Rights Plan with a 4.99% trigger] for the ostensible purpose of protecting NOLs from an `ownership change' under Section 382 of the Internal Revenue Code?" Second, *589 they submit that the Court of Chancery erred in holding that the two NOL poison pills, either individually or in combination with a charter-based classified Board, did not have a preclusive effect on the shareholders' ability to pursue a successful proxy contest for control of the Company's board. We conclude that both arguments are without merit.
In its cross-appeal, the Selectica related parties argue that the Court of Chancery erred in denying their application for an award of attorneys' fees under the bad faith exception to the American Rule. We conclude that argument is also without merit.

Facts[1]
The Court of Chancery described this as a case about the value of net operating loss carryforwards ("NOLs") to a currently profitless corporation, and the extent to which such a corporation may fight to preserve those NOLs. The Court of Chancery also provided a helpful overview of the concepts surrounding NOLs, their calculation, and possible impairment.
NOLs are tax losses, realized and accumulated by a corporation, that can be used to shelter future (or immediate past) income from taxation.[2] If taxable profit has been realized, the NOLs operate either to provide a refund of prior taxes paid or to reduce the amount of future income tax owed. Thus, NOLs can be a valuable asset, as a means of lowering tax payments and producing positive cash flow. NOLs are considered a contingent asset, their value being contingent upon the firm's reporting a future profit or having an immediate past profit.
Should the firm fail to realize a profit during the lifetime of the NOL (twenty years), the NOL expires. The precise value of a given NOL is usually impossible to determine since its ultimate use is subject to the timing and amount of recognized profit at the firm. If the firm never realizes taxable income, at dissolution its NOLs, regardless of their amount, would have zero value.
In order to prevent corporate taxpayers from benefiting from NOLs generated by other entities, Internal Revenue Code Section 382 establishes limitations on the use of NOLs in periods following an "ownership change." If Section 382 is triggered, the law restricts the amount of prior NOLs that can be used in subsequent years to reduce the firm's tax obligations.[3] Once NOLs are so impaired, a substantial portion of their value is lost.
The precise definition of an "ownership change" under Section 382 is rather complex. At its most basic, an ownership change occurs when more than 50% of a firm's stock ownership changes over a three-year period. Specific provisions in Section 382 define the precise manner by which this determination is made. Most importantly for purposes of this case, the only shareholders considered when calculating an ownership change under Section 382 are those who hold, or have obtained during the testing period, a 5% or greater block of the corporation's shares outstanding.

The Parties
Selectica, Inc. ("Selectica" or the "Company") is a Delaware corporation, head-quartered *590 in California and listed on the NASDAQ Global Market. It provides enterprise software solutions for contract management and sales configuration systems. Selectica is a micro-cap company with a concentrated shareholder base: the Company's seven largest investors own a majority of the stock, while fewer than twenty-five investors hold nearly two-thirds of the stock.[4]
Trilogy, Inc. ("Trilogy") is a Delaware corporation also specializing in enterprise software solutions. Trilogy stock is not publicly traded, and its founder, Joseph Liemandt, holds over 85% of the stock. Versata Enterprises, Inc. ("Versata"), a Delaware corporation and a subsidiary of Trilogy, provides technology powered business services to clients.
Before the events giving rise to this action, Versata and Trilogy beneficially owned 6.7% of Selectica's common stock. After they intentionally triggered Selectica's Shareholder Rights Plan through the purchase of additional shares, Versata's and Trilogy's joint beneficial ownership was diluted from 6.7% to approximately 3.3%.
James Arnold, Alan B. Howe, Lloyd Sems, Jim Thanos, and Brenda Zawatski are members of the Selectica Board of Directors (the "Board").[5] Zawatski and Thanos also served as Co-Chairs of the Board during the events at issue in the case.[6] In this role, they handled the day-to-day operations of the Company, as Selectica had been without a Chief Executive Officer since June 30, 2008.

Selectica's Historical Operating Difficulties
Since it became a public company in March 2000, Selectica has lost a substantial amount of money and failed to turn an annual profit, despite routinely projecting near-term profitability. Its IPO price of $30 per share has steadily fallen and now languishes below $1 per share, placing Selectica's market capitalization at roughly $23 million as of the end of March 2009. By Selectica's own admission, its value today "consists primarily in its cash reserves, its intellectual property portfolio, its customer and revenue base, and its accumulated NOLs." By consistently failing to achieve positive net income, Selectica has generated an estimated $160 million in NOLs for federal tax purposes over the past several years.

Selectica's Relationship with Trilogy
Selectica has had a complicated and often adversarial relationship with Trilogy, stretching back at least five years. Both companies compete in the relatively narrow market space of contract management and sales configuration. In April 2004, a Trilogy affiliate sued Selectica for patent infringement and secured a judgment that required Selectica, among other things, to pay Trilogy $7.5 million. While their suit was pending, in January 2005 Trilogy made an offer to buy Selectica for $4 per share in casha 20% premium above the then-trading pricewhich Selectica's Board rejected. Nevertheless, during *591 March and April of that year, a Trilogy affiliate acquired nearly 7% of Selectica's common stock through open market trades. In early fall 2005, Trilogy made another offer for Selectica's shares at a 16%-23% premium, which was also rejected.
In September 2006, a Trilogy-affiliated holder of Selectica stock sent a letter to the Board questioning whether certain stock option grants had been backdated.[7] The following month, Trilogy filed another patent infringement lawsuit against Selectica. That action was settled in October 2007, when Selectica agreed to a one-time payment of $10 million, plus an additional amount of not more than $7.5 million in subsequent payments to be made quarterly. In late fall 2006, Trilogy sold down its holdings in Selectica.

Steel Partners
Steel Partners is a private equity fund that has been a Selectica shareholder since at least 2006 and is currently its largest shareholder. One of Steel Partners' apparent investment strategies is to invest in small companies with large NOLs with the intent to pair the failing company with a profitable business in order to reap the tax benefits of the NOLs. Steel Partners has actively worked with Selectica to calculate and monitor the Company's NOLs since the time of its original investment.
By early 2008, Steel Partners was advocating a quick sale of Selectica's assets, leaving a NOL shell that could be merged with a profitable operating company in order to shelter the profits of the operating company. In October 2008, Steel Partners informed members of Selectica's Board that it planned to increase its ownership position to 14.9% just below the 15% trigger of the 2003 Rights Plan, which it later did. Jack Howard, President of Steel Partners, lobbied for a Board seat twice in 2008, citing his experience dealing with NOLs, but was rebuffed.

Selectica Investigates Its NOLs
In 2006, at the urging of Steel Partners, Selectica directed Alan Chinn, its outside tax adviser, to perform a high-level analysis into whether its NOLs were subject to any limitations under Section 382 of the Internal Revenue Code. Chinn concluded that five prior changes in ownership had caused the forfeiture of approximately $24.6 million in NOLs. Selectica provided the results of this study to Steel Partners, although not to any other Selectica shareholder.
In March 2007, again at Steel Partner's recommendation, Selectica retained a second accountant who specialized in NOL calculations, John Brogan of Burr Pilger & Mayer, LLP, to analyze the Company's NOLs more carefully and report on Chinn's Section 382 analysis. Brogan had previously analyzed the NOLs at other Steel Partners ventures. Brogan ultimately determined that Chinn's conclusions were erroneous.
The Company engaged Brogan to perform additional work on the topic of NOLs in June 2007. One of Steel Partners's employees, Avi Goodman, worked closely with Brogan on the matter, although Brogan *592 was working for and being paid by Selectica and received no compensation from Steel Partners. Brogan's draft letter opinion, concluding that the Company had not undergone an "ownership change" for Section 382 purposes since 1999, was shared with Steel Partners, although again not with any other outside investors.
In the fall of 2007, Brogan proposed a third, more detailed, Section 382 study, which Selectica's then-CEO, Robert Jurkowski, opposed. In February 2008, the Board voted against spending $40,000-$50,000 to fund this Section 382 study. By July, however, the Board asked Brogan to update his study. Brogan delivered the draft opinion that, as of March 31, 2008, the Company had approximately $165 million in NOLs. Brogan was later asked to advise the Board in the fall of 2008 on the updated status of its NOLs when the Board moved to amend its Rights Plan.

Lloyd Sems Elected Director
In April 2008, the Board began interviewing candidates for an open board seat, giving preference to the Company's large stockholders. Selectica investor Lloyd Sems had previously expressed interest in joining the Board and had sought support from certain shareholders, including Steel Partners, through Howard, and Lloyd Miller, another large Selectica shareholder not affiliated with Steel Partners. Both Miller and Howard wrote to the Board in support of Sems's appointment, although Sems was already favored by the Board by that time. In June 2008, Sems was appointed to the Board.
As large shareholders, Sems, Howard, and Miller had periodically discussed Selectica as early as October 2007. At that time, Sems had e-mailed Howard, stating, "I wanted to get your opinion of how or if you would like me to proceed with [Selectica]." Howard replied, "Lloyd [Miller] said he would call you about [Selectica]." Both before and after his appointment to the Board, Sems discussed with Howard and Miller a number of the proposals that Sems ultimately advocated as a director, including that Selectica should buy back its stock, that Selectica should consider selling its businesses, that the NOLs were important and should be preserved through the adoption of a Rights Plan with a 5% trigger, and that Jurkowski should be removed as CEO.

Selectica Restructures and Explores Alternatives
In early July 2008, after determining that the Company needed to change course, the Board terminated Jurkowski as CEO and eliminated several management positions in the sales configuration business. Later that month, prompted by the receipt of five unsolicited acquisition offers over the span of a few weeks, the Board announced that it was in the process of selecting an investment banker (ultimately, Jim Reilly of Needham & Company) to evaluate strategic alternatives for the Company and to assist with a process that ultimately might result in the Company's sale. In view of the potential sale, the Board decided to forgo the expense of replacing Jurkowski and, instead, asked Zawatski and Thanos jointly to assume the title of Co-Chair and to perform operational oversight roles on an interim basis.

The Needham Process
Needham has actively carried outs its task of evaluating Selectica's strategic options since its selection by the Board. Needham first discussed with the Board the various strategic choices that the Company could take. These included a merger of equals with a public company, a reverse IPO or other going-private transaction, the sale of certain assets, and the use of cash to acquire another company, as well as *593 stock repurchases or the issuance of dividends if Selectica decided to continue as an independent public company in the absence of sufficient market interest for an acquisition.
In October 2008, Needham prepared an Executive Summary of the assets and operations of Selectica and subsequently reached out to potential buyers, keeping in touch with various interested parties throughout the remainder of the year and into the first part of 2009. By February 2009, at least half a dozen parties had come forward with letters of intent and were in the process of meeting with Selectica management and conducting due diligence in the Company, with Needham evaluating their various proposals for the purchase of all or part of Selectica's operations. As of April 2009, Selectica, through Needham, had signed a letter of intent and entered into exclusive negotiations with a potential buyer.

Trilogy's Offers Rejected
On July 15, 2008, Trilogy's President, Joseph Liemandt, called Zawatski to inquire generally about the possibility of an acquisition of Selectica by Trilogy. On July 29, Trilogy Chief Financial Officer Sean Fallon, Trilogy Director of Finance Andrew Price, and Versata Chief Executive Officer Randy Jacops participated in a conference call with Selectica Co-Chairs Zawatski and Thanos on the same topic. During the call, Thanos inquired as to how Trilogy would calculate a value for the Company's NOLs. Fallon replied that Trilogy, "really [did not] pursue them with as much vigor as other[s] might since that is not our core strategy."[8]
The following evening, Fallon contacted Zawatski and outlined two proposals for Trilogy to acquire Selectica's business: (1) Trilogy's purchase of all of the assets of Selectica's sales configuration business in exchange for the cancellation of the $7.1 million in debt Selectica still owed under the October 2007 settlement with Trilogy; or (2) Trilogy's purchase of Selectica's entire operations for the cancellation of the debt plus an additional $6 million in cash. Fallon subsequently followed up with an email reiterating both proposals and suggesting that either proposal would allow Selectica to still make use of its NOLs through the later sale of its corporate entity.
Shortly thereafter, the Board rejected both proposals, made no counterproposal, and there were no follow-up discussions. On October 9, 2008, Trilogy made a second bid to acquire all of the Selectica's assets for $10 million in cash plus the cancellation of the debt, which the Board also rejected. Although Trilogy was invited to participate in the sale process being overseen by Needham, Trilogy was apparently unwilling to sign a non-disclosure agreement, which was a prerequisite for participation. Around this same time, Trilogy had begun making open-market purchases for Selectica stock, although the Board apparently was not aware of this fact at the time.

Trilogy Buys Selectica Stock
On the evening of November 10, Fallon contacted Zawatski and informed her that Trilogy had purchased more than 5% of Selectica's outstanding stock and would be filing a Schedule 13D shortly, which it did on November 13.[9] On a subsequent call *594 with Zawatski and Reilly, Fallon explained that Trilogy had begun buying because it believed that "the company should work quickly to preserve whatever shareholder value remained and that we were interested in seeing this process that they announced with Needham, that we were interested in seeing that accelerate...." Within four days of its 13D filing, Trilogy had acquired more than 320,000 additional shares, representing an additional 1% of the Company's outstanding shares.

NOL Poison Pill Adopted
In the wake of Trilogy's decision to begin acquiring Selectica shares, the Board took actions to gauge the impact of these acquisitions, if any, on the Company's NOLs, and to determine whether anything needed to be done to mitigate their effects. Sems immediately asked Brogan to revise his Section 382 analysiswhich had not been formally updated since Julyto take into account the recent purchases. The revised analysis was delivered to Sems and the Company's new CFO, Richard Heaps, on November 15. It showed that the cumulative acquisition of stock by shareholders over the past three years stood at 40%, which was roughly unchanged from the previous calculation, due to some double counting that occurred in the July analysis.[10]
The Board met on November 16 to discuss the situation and to consider amending Selectica's Shareholder Rights Plan, which had been in place since February 2003. As with many Rights Plans employed as protection devices against hostile takeovers, Selectica's Rights Plan had a 15% trigger. The Board considered an amendment that would reduce that threshold trigger to 4.99% in order to prevent additional 5% owners from emerging and potentially causing a change-in-control event, thereby devaluing Selectica's NOLs. Also present at the meeting were Heaps, Brogan, and Reilly, along with Delaware counsel.
Heaps gave an overview of the Company's existing Shareholder Rights Plan and reviewed the stock price activity since Trilogy had filed its Schedule 13D, noting that shares totaling approximately 2.3% of the Company had changed hands in the two days following the filing. Brogan reviewed the Section 382 ownership analysis that his firm had undertaken on behalf of the Company, noting that additional acquisitions of roughly 10% of the float by new or existing 5% holders would "result in a permanent limitation on use of the Company's net operating loss carryforwards and that, once an ownership change occurred, there would be no way to cure the use limitation on the net operating loss carryforwards." He further advised the Board that "net operating loss carryforwards were a significant asset" and that he generally advises companies to consider steps to protect their NOLs when they experience a 30% or greater change in beneficial ownership. Lastly, Brogan noted that, while he believed that the cumulative ownership change calculations would decline significantly over the next twelve months, "it would decline only modestly, if at all, over the next three to four months," meaning that "the Company would continue to be at risk of an ownership change over the near term."
Reilly discussed the Company's strategic alternatives and noted that Steel Partners and other parties had expressed interest in pursuing a transaction that would realize *595 the value of Selectica's NOLs. He also reviewed potential transaction structures in which the Company might be able to utilize its NOLs. Responding to questions from the Board, Reilly noted that "it is difficult to value the Company's net operating loss carryforwards with greater precision, because their value depends, among other things, on the ability of the Company to generate profits." He confirmed that "existing stockholders may realize significant potential value" from the utilization of the Company's NOLs, which would be "significantly impaired" if a Section 382 ownership change occurred.
At the request of the Board, Delaware counsel reviewed the Delaware law standards that apply for adopting and implementing measures that have an anti-takeover effect. The Board then discussed amending the existing Shareholder Rights Plan, and the possible terms of such an amendment. These included: the pros and cons of providing a cushion for preexisting 5% holders, the appropriate effective date of the new Shareholder Rights Plan, whether the Board should have authority to exclude purchases by specific stockholders from triggering the Rights Plan, and whether a review process should be implemented to determine periodically whether the Rights Plan should remain in effect.
The Board then unanimously passed a resolution amending Selectica's Shareholder Rights Plan, by decreasing the beneficial ownership trigger from 15% to 4.99%, while grandfathering in existing 5% shareholders and permitting them to acquire up to an additional 0.5% (subject to the original 15% cap) without triggering the NOL Poison Pill.
The Board resolution also established an Independent Director Evaluation Committee (the "Committee") as a standing committee of the Board to review periodically the rights agreement at the behest of the Board and to "determine whether the Rights [Plan] continues to be in the best interest of the Corporation and its stockholders." The Committee was also directed to review "the appropriate trigger percentage" of the Rights Plan based on corporate and shareholder developments, any broader developments relating to rights plans generallyincluding academic studies of rights plans and contests for corporate controland any other factors it deems relevant. The Board set April 30, 2009, as the first date that the Committee should report its findings.

Trilogy Triggers NOL Poison Pill
The Board publicly announced the amendment of Selectica's Rights Plan on Monday, November 17. Early the following morning, Fallon e-mailed Trilogy's broker, saying "[W]e need to stop buying SLTC. They announced a new pill and we need to understand it." Fallon also sent Liemandt a copy of Selectica's 8-K containing the amended language of the NOL Poison Pill. Trilogy immediately sought legal advice about the NOL Poison Pill. The following morning, Liemandt e-mailed Price, with a copy to Fallon, asking, "What percentage of [Selectica] would we need to buy to ruin the tax attributes that [S]teel [P]artners is looking for?"[11] They concluded that they would need to acquire 23% to trigger a change-in-control event.
Later that week, Trilogy sent Selectica a letter asserting that a Selectica contract *596 with Sun Microsystems constituted a breach of the October 2007 settlement and seeking an immediate meeting with Selectica purportedly to discuss the breach, even though members of Trilogy's management had been on notice of the contract as early as July. Fallon, Liemandt, and Jacops from Trilogy, along with Zawatski, Thanos, and Heaps from Selectica met on December 17. The parties' discussions at this meeting are protected by a confidentiality agreement that had been circulated in advance. However, Selectica contends that "based solely on statements and conduct outside that meeting, it is evident that Trilogy threatened to trigger the NOL Poison Pill deliberately unless Selectica agreed to Trilogy's renewed efforts to extract money from the Company."
On December 18, Trilogy purchased an additional 30,000 Selectica shares, and Trilogy management verified with Liemandt his intention to proceed with "buying through" the NOL Poison Pill. The following morning, Trilogy purchased an additional 124,061 shares of Selectica, bringing its ownership share to 6.7% and thereby becoming an "Acquiring Person" under the NOL Poison Pill. Liemandt testified that the rationale behind triggering the pill was to "bring accountability" to the Board and "expose" what Liemandt characterized as "illegal behavior" by the Board in adopting a pill with such a low trigger. Fallon asserted that the reason for triggering the NOL Poison Pill was to "bring some clarity and urgency" to their discussions with Selectica about the two parties' somewhat complicated relationship by "setting a time frame that might help accelerate discussions" on the direction of the business.
Fallon placed a telephone call to Zawatski on December 19 to advise her that Trilogy had bought through the NOL Poison Pill. During a return call by Zawatski later that evening, Fallon indicated that Trilogy felt, based on the conversations from December 17, that Selectica no longer wanted Trilogy as a shareholder or creditor. He then proposed that Selectica repurchase Trilogy's shares, accelerate the payment of its debt, terminate its license with Sun, and make a payment to Trilogy of $5 million "for settlement of basically all outstanding issues between our companies." Zawatski recalled that Fallon told her that Trilogy had triggered the pill "to get our attention and create a sense of urgency;" that, since the Board would have ten days to determine how to react to the pill trigger, "it would force the board to make a decision."

Board Considers Options and Requests a Standstill
The Selectica Board had a telephonic meeting on Saturday, December 20, to discuss Trilogy's demands and an appropriate response. The Board discussed "the desirability of taking steps to ensure the validity of the Shareholder Rights Plan," and ultimately passed a resolution authorizing the filing of this lawsuit, which occurred the following day. On December 22, Trilogy filed an amended Schedule 13D disclosing its ownership percentage and again the Selectica Board met telephonically to discuss the litigation. It eventually agreed to have a representative contact Trilogy to seek a standstill on any additional open market purchases while the Board used the ten-day clock under the NOL Poison Pill to determine whether to consider Trilogy's purchases "exempt" under the Rights Plan, and if not, how Selectica would go about implementing the pill.
The amended Rights Plan allowed the Board to declare Trilogy an "Exempt Person" during the ten-day period following the trigger, if the Board determined that Trilogy would not "jeopardize or endanger the availability to the Company of the NOLs...." The Board could also decide *597 during this window to exchange the rights (other than those held by Trilogy) for shares of common stock. If the Board did nothing, then after ten days the rights would "flip in" automatically, becoming exercisable for $36 worth of newly-issued common stock at a price of $18 per right.
The Board met again by telephone the following day, December 23, to discuss the progress of the litigation and to consider the potential impact of the various alternatives under the NOL Poison Pill. The Board agreed to meet in person the following Monday, December 29, along with the Company's financial, legal, and accounting advisors, to evaluate further the available options. The Board also voted to reduce the number of authorized directors from seven to five.
On Wednesday, December 24, the Board met once again by telephone upon learning that the Company's counsel had not succeeded in convincing Trilogy to agree to a standstill. The Board resolved that Zawatski should call Fallon to determine whether Trilogy was willing "to negotiate a standstill agreement that might make triggering the remedies available under the Shareholder Rights Plan, as amended, unnecessary at this time." Zawatski spoke with Fallon on the morning of December 26. Fallon stated that Trilogy did not want to agree to a standstill, that relief from the NOL Poison Pill was not Trilogy's goal, and that Trilogy expected that the NOL Poison Pill would apply to it. Fallon reiterated that the ten-day window would help "speed [the] course" towards a resolution of their claims.
The Board and its advisors met again on December 29. Thanos provided an update on recent developments at the Company, including financial results, management changes, and the Needham Process, as well as an overview of the make-up of the Company's shareholder base. Reilly then provided a more detailed report on the status of the Needham Process. Thereafter, Brogan presented his firm's updated analysis of Selectica's NOLs, which found that the Company had at least $160 million in NOLs and that there had been a roughly 40% ownership change by 5% holders over the three-year testing period. Since those were not expected to "roll off" in the near term, there was "a significant risk of a Section 382 ownership change."
Brogan subsequently discussed the possible consequences of the two principal mechanisms for implementing the triggered NOL Poison Pill to the change-in-control analysis. He stated that employing a share exchange would not likely have a materially negative impact on the Section 382 analysis. He expressed concern, however, about the uncertain effect of a flip-in pill on subsequent ownership levels (specifically, the possibility that a flip-in pill would, itself, trigger a Section 382 ownership change). Reilly once again addressed the Board to explain the ways he believed the NOLs would be valuable to the Company in its ongoing exploration of strategic alternatives, and reiterated his opinion that an ownership change would "reduce the value of the Company."
The Board also discussed Trilogy's settlement demands. It found them "highly unreasonable" and "lack[ing] any reasonable basis in fact," and that "it [was] not in the best interests of the Company and its stockholders to accept Trilogy/Versata's settlement demands relating to entirely separate intellectual property disputes as a precondition to negotiating a standstill agreement to resolve this dispute." The Board discussed Trilogy's actions at some length, ultimately concluding that they "were very harmful to the Company in a number of respects," and that "implementing the exchange was reasonable in relation to the threat imposed by Trilogy." In *598 particular, that was because (1) the NOLs were seen as "an important corporate asset that could significantly enhance stockholder value," and (2) Trilogy had intentionally triggered the NOL Poison Pill, publicly suggested it might purchase additional stock, and had refused to negotiate a standstill agreement, even though an additional 10% acquisition by a 5% shareholder would likely trigger an ownership change under Section 382.
The Board then authorized Delaware counsel to contact Trilogy in writing, one final time, to seek a standstill agreement. It also passed resolutions delegating the full power of the Board to the Committee to determine whether or not to treat Trilogy or its acquisition as "exempt," and nominating Alan Howe as a new member of the Board. On the evening of December 29, Selectica's Delaware counsel e-mailed Trilogy's trial counsel at the Board's instruction, seeking a standstill agreement "so that the Board could consider either declaring them an `Exempt Person' under the Rights Plan ... or alternatively, settle the litigation altogether in exchange for a long term agreement relating to your clients' ownership of additional shares." The following afternoon, Trilogy's counsel responded that Trilogy was not willing to agree to the proposed standstill.
Two days later, on December 31, the Board met telephonically and was informed of Trilogy's latest rejection of a standstill agreement. The Board discussed its options with its legal advisors and ultimately concluded that the NOL Poison Pill should go into effect and that an exchange was the best alternative and should be implemented as soon as possible in order to protect the NOLs, even at the risk of disrupting common stock trading. The Board directed advisers to prepare a technical amendment to the NOL Poison Pill to clarify the time at which the exchange would become effective.

Board Adopts Reloaded Pill and Dilutes Trilogy Holdings
On January 2, the Board met telephonically once more, reiterating its delegation of authority to the Committee to make recommendations regarding the implementation of the NOL Poison Pill. The Board also passed a resolution expressly confirming that the Board's delegation of authority to the Committee included the power to effect an exchange of the rights under the NOL Poison Pill and to declare a new dividend of rights under an amended Rights Plan (the "Reloaded NOL Poison Pill"). The Board then adjourned and the Committeecomprised of Sems and Arnoldmet with legal and financial advisors, who confirmed that there had been no new agreement with representatives from Trilogy, reiterated that the NOLs remained "a valuable corporate asset of the Company in connection with the Company's ongoing exploration of strategic alternatives," and advised the Committee members of their fiduciary obligations under Delaware law.
Reilly presented information to the Committee about the current takeover environment and the use of Rights Plans (specifically, the types of pills commonly employed and their triggering thresholds), and reviewed the Company's then-current anti-takeover defenses compared with those of other public companies. Reilly stated that "a so-called NOL rights plan with a 4.99% trigger threshold is designed to help protect against stock accumulations that would trigger an `ownership change,'" and that "implementing appropriate protections of the Company's net operating loss carryforwards was especially important at present," given Trilogy's recent share acquisitions superimposed on the Company's existing Section 382 ownership *599 levels. Finally, Reilly reviewed the proposed terms and conditions of the Reloaded NOL Poison Pill, discussed the methodology for determining the exercise price of the new rights, and made recommendations. The Committee sought and obtained reconfirmed assurances by its financial and legal advisors that the NOLs were a valuable corporate asset and that they remained at a significant risk of being impaired.
The Committee concluded that Trilogy should not be deemed an "Exempt Person," that its purchase of additional shares should not be deemed an "Exempt Transaction," that an exchange of rights for common stock (the "Exchange") should occur, and that a new rights dividend on substantially similar terms should be adopted. The Committee passed resolutions implementing those conclusions, thereby adopting the Reloaded NOL Poison Pill and instituting the Exchange.
The Exchange doubled the number of shares of Selectica common stock owned by each shareholder of record, other than Trilogy or Versata, thereby reducing their beneficial holdings from 6.7% to 3.3%. The implementation of the Exchange led to a freeze in the trading of Selectica stock from January 5, 2009 until February 4, 2009, with the stock price frozen at $0.69. The Reloaded NOL Poison Pill will expire on January 2, 2012, unless the expiration date is advanced or extended, or unless these rights are exchanged or redeemed by the Board some time before.

ANALYSIS

Unocal Standard Applies

In Unocal, this Court recognized that "our corporate law is not static. It must grow and develop in response to, indeed in anticipation of, evolving concepts and needs."[12] The Court of Chancery concluded that the protection of company NOLs may be an appropriate corporate policy that merits a defensive response when they are threatened. We agree.
The Unocal two part test is useful as a judicial analytical tool because of the flexibility of its application in a variety of fact scenarios.[13] Delaware courts have approved the adoption of a Shareholder Rights Plan as an antitakeover device, and have applied the Unocal test to analyze a board's response to an actual or potential hostile takeover threat.[14] Any NOL poison pill's principal intent, however, is to prevent the inadvertent forfeiture of potentially valuable assets, not to protect against hostile takeover attempts.[15] Even so, any Shareholder Rights Plan, by its nature, operates as an antitakeover device. Consequently, notwithstanding its primary purpose, a NOL poison pill must also be analyzed under Unocal because of its effect and its direct implications for hostile takeovers.

Threat Reasonably Identified
The first part of Unocal review requires a board to show that it had reasonable grounds for concluding that a threat to the corporate enterprise existed. The Selectica Board concluded that the *600 NOLs were an asset worth preserving and that their protection was an important corporate objective. Trilogy contends that the Board failed to demonstrate that it conducted a reasonable investigation before determining that the NOLs were an asset worth protecting. We disagree.
The record reflects that the Selectica Board met for more than two and a half hours on November 16. The Court of Chancery heard testimony from all four directors and from Brogan, Reilly, and Heaps, who also attended that meeting and advised the Board. The record shows that the Board first analyzed the NOLs in September 2006, and sought updated Section 382 analyses from Brogan in March 2007, June 2007, and July 2008. At the November 16 meeting, Brogan advised the Board that the NOLs were a "significant asset" based on his recently updated calculations of the NOLs' magnitude. Reilly, an investment banker, similarly advised the Board that the NOLs were worth protecting given the possibility of a sale of Selectica or its assets. Accordingly, the record supports the Court of Chancery's factual finding that the Board acted in good faith reliance on the advice of experts[16] in concluding that "the NOLs were an asset worth protecting and thus, that their preservation was an important corporate objective."
The record also supports the reasonableness of the Board's decision to act promptly by reducing the trigger on Selectica's Rights Plan from 15% to 4.99%. At the November 16 meeting, Brogan advised the Board that the change-of-ownership calculation under Section 382 stood at approximately 40%. Trilogy's ownership had climbed to over 5% in just over a month, and Trilogy intended to continue buying more stock. There was nothing to stop others from acquiring stock up to the 15% trigger in the Company's existing Rights Plan. Once the Section 382 limitation was tripped, the Board was advised it could not be undone.
At the November 16 meeting, the Board voted to amend Selectica's existing Rights Plan to protect the NOLs against a potential Section 382 "change of ownership." It reduced the trigger of its Shareholders Rights Plan from 15% to 4.99% and provided that existing shareholders who held in excess of 4.99% would be subject to dilutive consequences if they increased their holdings by 0.5%. The Board also created the Review Committee (Arnold and Sems) with a mandate to conduct a periodic review of the continuing appropriateness of the NOL Poison Pill.
The Court of Chancery found the record "replete with evidence" that, based upon the expert advice it received, the Board was reasonable in concluding that Selectica's NOLs were worth preserving and that Trilogy's actions presented a serious threat of their impairment. The Court of Chancery explained those findings, as follows:
The threat posed by Trilogy was reasonably viewed as qualitatively different from the normal corporate control dispute that leads to the adoption of a shareholder rights plan. In this instance, *601 Trilogy, a competitor with a contentious history, recognized that harm would befall its rival if it purchased sufficient shares of Selectica stock, and Trilogy proceeded to act accordingly. It was reasonable for the Board to respond, and the timing of Trilogy's campaign required the Board to act promptly. Moreover, the 4.99% threshold for the NOL Poison Pill was driven by our tax laws and regulations; the threshold, low as it is, was measured by reference to an external standard, one created neither by the Board nor by the Court [of Chancery]. Within this context, it is not for the Court [of Chancery] to second-guess the Board's efforts to protect Selectica's NOLs.
Those findings are not clearly erroneous.[17] They are supported by the record and the result of a logical deductive reasoning process.[18] Accordingly, we hold that the Selectica directors satisfied the first part of the Unocal test by showing "that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership."[19]

Selectica Defenses Not Preclusive
The second part of the Unocal test requires an initial evaluation of whether a board's defensive response to the threat was preclusive or coercive and, if neither, whether the response was "reasonable in relation to the threat" identified.[20] Under Unitrin, a defensive measure is disproportionate and unreasonable per se if it is draconian by being either coercive or preclusive.[21] A coercive response is one that is "aimed at `cramming down' on its shareholders a management-sponsored alternative."[22]
A defensive measure is preclusive where it "makes a bidder's ability to wage a successful proxy contest and gain control either `mathematically impossible' or `realistically unattainable.'"[23] A successful proxy contest that is mathematically impossible is, ipso facto, realistically unattainable. Because the "mathematically impossible" formulation in Unitrin is subsumed within the category of preclusivity described as "realistically unattainable," there is, analytically speaking, only one test of preclusivity: "realistically unattainable."
Trilogy claims that a Rights Plan with a 4.99% trigger renders the possibility of an effective proxy contest realistically unattainable. In support of that position, Trilogy argues that, because a proxy contest can only be successful where the challenger has sufficient credibility, the 4.99% pill trigger prevents a potential dissident from signaling its financial commitment to the company so as to establish such credibility. In addition, Professor Ferrell, Trilogy's expert witness, testified that the 5% cap on *602 ownership exacerbates the free rider problem already experienced by investors considering fielding an insurgent slate of directors, and makes initiating a proxy fight an economically unattractive proposition.[24]
This Court first examined the validity of a Shareholder Rights Plan in Moran v. Household International, Inc.[25] In Moran the Rights Plan at issue had a 20% trigger.[26] We recognized that, while a Rights Plan "does deter the formation of proxy efforts of a certain magnitude, it does not limit the voting power of individual shares."[27] In Moran, we concluded that the assertion that a Rights Plan would frustrate proxy fights was "highly conjectural" and pointed to "recent corporate takeover battles in which insurgents holding less than 10% stock ownership were able to secure corporate control through a proxy contest or the threat of one."[28]
The 5% trigger that is necessary for a NOL poison pill to serve its primary objective imposes a lower threshold than the Rights Plan thresholds that have traditionally been adopted and upheld as acceptable anti-takeover defenses by Delaware courts. Selectica submits that the distinguishing feature of the NOL Poison Pill and Reloaded NOL Poison Pillthe 5% trigger is not enough to differentiate them from other Rights Plans previously upheld by Delaware courts, and that there is no evidence that a challenger starting below 5% could not realistically hope to prevail in a proxy contest at Selectica. In support of those arguments Selectica presented expert testimony from Professor John C. Coates IV and Peter C. Harkins.
Professor Coates identified more than fifty publicly held companies that have implemented NOL poison pills with triggers at roughly 5%, including several large, well-known corporations, some among the Fortune 1000. Professor Coates noted that 5% Rights Plans are customarily adopted where issuers have "ownership controlled" assets, such as the NOLs at issue in this case. Professor Coates also testified that Selectica's 5% Rights Plan trigger was narrowly tailored to protect the NOLs because the relevant tax law, Section 382, measures ownership changes based on shareholders who own 5% or more of the outstanding stock.
Moreover, and as the Court of Chancery noted, shareholder advisory firm RiskMetrics Group now supports Rights Plans with a trigger below 5% on a case-by-case basis if adopted for the stated purpose of preserving a company's net operating losses.[29] The factors RiskMetrics will consider *603 in determining whether to support a management proposal to adopt a NOL poison pill are the pill's trigger, the value of the NOLs, the term of the pill, and any corresponding shareholder protection mechanisms in place, such as a sunset provision causing the pill to expire upon exhaustion or expiration of the NOLs.[30]
Selectica expert witness Harkins of the D.F. King & Co. proxy solicitation firm analyzed proxy contests over the three-year period ending December 31, 2008. He found that of the fifteen proxy contests that occurred in micro-cap companies where the challenger controlled less than 5.49% of the outstanding shares, the challenger successfully obtained board seats in ten contests, five of which involved companies with classified boards.[31] Harkins opined that Selectica's unique shareholder profile would considerably reduce the costs associated with a proxy fight, since seven shareholders controlled 55% of Selectica's shares, and twenty-two shareholders controlled 62%. Harkins testified that "if you have a compelling platform, which is critical, it would be easy from a logistical perspective; and from a cost perspective, it would be de minimis expense to communicate with those investors, among others." Harkins noted that to win a proxy contest at Selectica, one would need to gain only the support of owners of 43.2% plus one share.[32]
The Court of Chancery concluded that the NOL Poison Pill and Reloaded NOL Poison Pill were not preclusive. For a measure to be preclusive, it must render a successful proxy contest realistically unattainable given the specific factual context. The record supports the Court of Chancery's factual determination and legal conclusion that Selectica's NOL Poison Pill and Reloaded NOL Poison Pill do not meet that preclusivity standard.
Our observation in Unitrin is also applicable here: "[I]t is hard to imagine a company more readily susceptible to a proxy contest concerning a pure issue of dollars."[33] The key variable in a proxy contest would be the merit of the bidder's proposal and not the magnitude of its stockholdings.[34] The record reflects that Selectica's adoption of a 4.99% trigger for its Rights Plan would not preclude a hostile bidder's ability to marshal enough shareholder votes to win a proxy contest.
Trilogy argues that, even if a 4.99% shareholder could realistically win a proxy contest "the preclusiveness question focuses on whether a challenger could realistically *604 attain sufficient board control to remove the pill." Here, Trilogy contends, Selectica's charter-based classified board effectively forecloses a bid conditioned upon a redemption of the NOL Poison Pill, because it requires a proxy challenger to launch and complete two successful proxy contests in order to change control. Therefore, Trilogy argues that even if a less than 5% shareholder could win a proxy contest, Selectica's Rights Plan with a 4.99% trigger in combination with Selectica's charter-based classified board, makes a successful proxy contest for control of the board "realistically unattainable."
Trilogy's preclusivity argument conflates two distinct questions: first, is a successful proxy contest realistically attainable; and second, will a successful proxy contest result in gaining control of the board at the next election? Trilogy argues that unless both questions can be answered affirmatively, a Rights Plan and a classified board, viewed collectively, are preclusive. If that preclusivity argument is correct, then it would apply whenever a corporation has both a classified board and a Rights Plan, irrespective whether the trigger is 4.99%, 20%, or anywhere in between those thresholds.
Classified boards are authorized by statute[35] and are adopted for a variety of business purposes. Any classified board also operates as an antitakeover defense by preventing an insurgent from obtaining control of the board in one election.[36] More than a decade ago, in Carmody, the Court of Chancery noted "because only one third of a classified board would stand for election each year, a classified board would delaybut not preventa hostile acquiror from obtaining control of the board, since a determined acquiror could wage a proxy contest and obtain control of two thirds of the target board over a two year period, as opposed to seizing control in a single election."[37] The fact that a combination of defensive measures makes it more difficult for an acquirer to obtain control of a board does not make such measures realistically unattainable, i.e., preclusive.[38]
In Moran, we rejected the contention "that the Rights Plan strips stockholders of their rights to receive tender offers, and that the Rights Plan fundamentally restricts proxy contests."[39] We explained that "the Rights Plan will not have a severe impact upon proxy contests and it will not preclude all hostile acquisitions of Household."[40] In this case, we hold that the combination of a classified board and a Rights Plan do not constitute a preclusive defense.[41]

*605 Range of Reasonableness

If a defensive measure is neither coercive nor preclusive, the Unocal proportionality test "requires the focus of enhanced judicial scrutiny to shift to `the range of reasonableness.'"[42] Where all of the defenses "are inextricably related, the principles of Unocal require that such actions be scrutinized collectively as a unitary response to the perceived threat."[43] Trilogy asserts that the NOL Poison Pill, the Exchange, and the Reloaded NOL Poison Pill were not a reasonable collective response to the threat of the impairment of Selectica's NOLs.
The critical facts do not support that assertion. On November 20, within days of learning of the NOL Poison Pill, Trilogy sent Selectica a letter, demanding a conference to discuss an alleged breach of a patent settlement agreement between the parties. The parties met on December 17, and the following day, Trilogy resumed its purchases of Selectica stock.
Fallon testified that he and Liemandt had a discussion wherein Fallon advised Liemandt that Trilogy had purchased additional shares, but not enough to trigger the NOL Poison Pill. Fallon then asked if Liemandt really wanted to trigger the pill, and Liemandt expressly directed Fallon to proceed. On December 19, 2008, Trilogy bought a sufficient number of shares to become an "Acquiring Person" under the NOL Poison Pill. According to Fallon, this was done to "`bring some clarity and urgency' to Trilogy's discussions with Selectica about the two parties' somewhat complicated relationship by `setting a time frame that might help accelerate discussions' on the direction of the business."
Fallon described Trilogy's relationship with Selectica as a "three-legged stool," referring to Trilogy's status as a competitor, a creditor, and a stockholder of Selectica. The two companies had settled prior patent disputes in 2007 under terms that included a cross-license of intellectual property and quarterly payments from Selectica to Trilogy based on Selectica's revenues from certain products. Selectica argues that Trilogy took the unprecedented step of deliberately triggering the NOL Poison Pillexposing its equity investment of under $2 million to dilutionprimarily to extract substantially more value for the other two "legs" of the stool.
Trilogy's deliberate trigger started a ten business day clock under the terms of the NOL Poison Pill. If the Board took no action during that time, then the rights (other than those belonging to Trilogy) would "flip-in" and become exercisable for deeply discounted common stock. Alternatively, the Board had the power to exchange the rights (other than those belonging to Trilogy) for newly-issued common stock, or to grant Trilogy an exemption. Three times in the two weeks following the triggering, Selectica offered Trilogy an exemption in exchange for an agreement to stand still and to withdraw its threat to impair the value and usability of Selectica's NOLs. Three times Trilogy refused and insisted instead that Selectica repurchase its stock, terminate a license agreement with an important client, sign over intellectual property, *606 and pay Trilogy millions of dollars. After three failed attempts to negotiate with Trilogy, it was reasonable for the Board to determine that they had no other option than to implement the NOL Poison Pill.
The Exchange employed by the Board was a more proportionate response than the "flip-in" mechanism traditionally envisioned for a Rights Plan. Because the Board opted to use the Exchange instead of the traditional "flip-in" mechanism, Trilogy experienced less dilution of its position than a Rights Plan is traditionally designed to achieve.
The implementation of the Reloaded NOL Poison Pill was also a reasonable response. The Reloaded NOL Poison Pill was considered a necessary defensive measure because, although the NOL Poison Pill and the Exchange effectively thwarted Trilogy's immediate threat to Selectica's NOLs, they did not eliminate the general threat of a Section 382 change-in-control. Following implementation of the Exchange, Selectica still had a roughly 40% ownership change for Section 382 purposes and there was no longer a Rights Plan in place to discourage additional acquisitions by 5% holders. Selectica argues that the decision to adopt the Reloaded NOL Poison Pill was reasonable under those circumstances. We agree.
The record indicates that the Board was presented with expert advice that supported its ultimate findings that the NOLs were a corporate asset worth protecting, that the NOLs were at risk as a result of Trilogy's actions, and that the steps that the Board ultimately took were reasonable in relation to that threat.[44] Outside experts were present and advised the Board on these matters at both the November 16 meeting at which the NOL Poison Pill was adopted and at the Board's December 29 meeting. The Committee also heard from expert advisers a third time at the January 2 meeting prior to instituting the Exchange and adopting the Reloaded NOL Poison Pill.
Under part two of the Unocal test, the Court of Chancery found that the combination of the NOL Poison Pill, the Exchange, and the Reloaded NOL Poison Pill was a proportionate response to the threatened loss of Selectica's NOLs. Those findings are not clearly erroneous.[45] They are supported by the record and the result of a logical deductive reasoning process.[46] Accordingly, we hold that the Selectica directors satisfied the second part of the Unocal test by showing that their defensive response was proportionate by being "reasonable in relation to the threat" identified.[47]

Context Determines Reasonableness
Under a Unocal analysis, the reasonableness of a board's response is determined in relation to the "specific threat," at the time it was identified.[48] Thus, it is the specific nature of the threat that "sets the parameters for the range of permissible defensive tactics" at any given time.[49] The record demonstrates that a longtime competitor sought to increase the percentage of its stock ownership, not for the purpose of conducting a hostile takeover but, to intentionally impair corporate assets, or else coerce Selectica into meeting *607 certain business demands under the threat of such impairment. Only in relation to that specific threat have the Court of Chancery and this Court considered the reasonableness of Selectica's response.
The Selectica Board carried its burden of proof under both parts of the Unocal test. Therefore, at this time, the Selectica Board has withstood the enhanced judicial scrutiny required by the two part Unocal test. That does not, however, end the matter.[50]
As we held in Moran, the adoption of a Rights Plan is not absolute.[51] In other cases, we have upheld the adoption of Rights Plans in specific defensive circumstances while simultaneously holding that it may be inappropriate for a Rights Plan to remain in place when those specific circumstances change dramatically. The fact that the NOL Poison Pill was reasonable under the specific facts and circumstances of this case, should not be construed as generally approving the reasonableness of a 4.99% trigger in the Rights Plan of a corporation with or without NOLs.[52]
To reiterate Moran, "the ultimate response to an actual takeover bid must be judged by the Directors' actions at that time."[53] If and when the Selectica Board "is faced with a tender offer and a request to redeem the [Reloaded NOL Poison Pill], they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards any other board of directors would be held to in deciding to adopt a defensive mechanism."[54] The Selectica Board has no more discretion in refusing to redeem the Rights Plan "than it does in enacting any defensive mechanism."[55] Therefore, the Selectica Board's future use of the Reloaded NOL Poison Pill must be evaluated if and when that issue arises.[56]

Cross-Appeal
We review the Court of Chancery's denial of attorneys' fees under the bad faith exception to the American Rule for abuse of discretion.[57] Generally, the bad faith exception for the American Rule for attorneys' fees "does not apply to the conduct that gives rise to the substantive claim itself."[58] Accordingly, "an award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action."[59]
In its cross-appeal, seeking to reverse the Court of Chancery's denial of its request for attorneys' fees, Selectica relies primarily on the following facts: first, Trilogy's deliberate decision to purchase shares beyond the NOL Poison Pill trigger; *608 second, Trilogy's refusal to agree to a standstill in exchange for an exemption; and third, Trilogy's attempt to negotiate a global settlement with respect to its pending disputes with Selectica. In response to Trilogy's insistence upon a global settlement of the parties' conflicts, Selectica engaged litigation counsel. Two days after Trilogy became an "Acquiring Person" under the NOL Poison Pill, Selectica filed its declaratory judgment lawsuit against Trilogy in the Court of Chancery, on December 21, 2008. On January 3, 2009, Selectica amended its Complaint to add factual allegations of Trilogy's deliberate decision to become an "Acquiring Person" under the NOL Poison Pill; Trilogy's refusal to agree to a standstill; and Trilogy's insistence that any settlement discussions relate to a global resolution of all disputes pending between the parties. These facts constitute the substance of Selectica's claim for declaratory relief. Therefore, they cannot provide a basis to award attorneys' fees under the general bad faith exception to the American Rule.[60]
We recognize that the Court of Chancery found as a fact that Trilogy deliberately triggered the NOL Poison Pill and did so realizing that the trigger would inflict harm on Selectica. Specifically, the Court of Chancery stated: "Trilogy, a competitor with a contentious history, recognized that harm would befall its rival if it purchased sufficient shares of Selectica stock, and Trilogy proceeded accordingly." However, even if the Court of Chancery's opinion is construed as finding that Trilogy acted in bad faith, and even if that finding pertained to conduct that occurred during the litigation, the Court of Chancery still had discretion to deny Selectica's attorneys' fee request.
Reasonable minds can differ about whether Selectica's motion for attorneys' fees should have been granted. However, the Court of Chancery's decision to deny that motion was neither arbitrary nor capricious. Our decision must be guided by the applicable standard of appellate review. When an act of judicial discretion is at issue, the appellate court "may not substitute its own notions of what is right for those of the trial judge, if [that] judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[61]

Conclusion
The judgments of the Court of Chancery are affirmed.
NOTES
[1] The facts are taken from the Court of Chancery's opinion.
[2] NOLs may be carried backward two years and carried forward twenty years.
[3] The annual limitation on the use of past period NOLs following a change-in-control is calculated as the value of the firm's equity at the time of the ownership change, multiplied by a published rate of return, the federal long term exemption rate.
[4] However, because of the Shareholder Rights Plan first instituted in 2003, no stockholder holds more than 15% of the outstanding shares.
[5] Alan Howe was elected to the Board on January 12, 2009, after the events at issue in this case. He has not been charged with any breach of fiduciary duty and has not been served with process. Trilogy purports to name Howe as a Counterclaim-Defendant solely "in order to afford [Trilogy] complete relief."
[6] On August 19, 2009, Thanos stepped down as Co-Chair and Zawatski became sole Chair of the Board and continued to handle the Company's daily operations.
[7] A special committee empanelled by the Board ultimately concluded that certain options had, in fact, been backdated. Consequently, Selectica was required to restate its financial statements to record additional stock-based compensation and related tax effects for past option grants and incurred fees associated with the investigation in excess of $6.2 million. This episode also led to the resignation of Selectica's then-Chairmen and Chief Executive Officer Stephen Bannion (who had been the Company's Chief Financial Officer at the time of the grants of question) and the appointment of then-Director Robert Jurkowski to the Chief Executive and Chair position.
[8] However, as part of its 2005 effort to acquire Selectica, Trilogy had performed "a pretty detailed analysis" of Selectica's NOLs. Johnston testified that this analysis was occasionally updated and that similar analyses had been performed on a dozen or so other acquisition targets.
[9] The November 13, 2008, Schedule 13D reported that Versata and affiliates had purchased 1,437,891 shares of Selectica stock, increasing its ownership to 5.1%.
[10] A more formal analysis was provided on November 26, finding a 38.8% change in ownership over the relevant period.
[11] Liemandt testified that his question meant, "what is the amount that we can buy without hurting it, which is the other way of asking, what's the amount you can buy to ruin it." Price testified, however, that he understood the question as being more straightforward, specifically, "what percentage would we have to buy to trigger a change of control as per Section 382."
[12] Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 957 (Del.1985).
[13] Paramount Communications, Inc. v. Time, Inc., 571 A.2d 1140, 1153 (Del.1990).
[14] Moran v. Household Int'l, Inc., 500 A.2d 1346, 1356 (Del.1985).
[15] The Court of Chancery found that "typically, companies with large NOLs would not be at risk of takeover attempts if the NOLs are the company's principal asset, as the takeover would likely trigger a change in control and impair the asset."
[16] The Delaware General Corporation Law Section § 141(e), states:

A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith . . . upon such information, opinions, reports or statements presented to the corporation ... by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.
Del.Code Ann. tit. 8, § 141(e) (2010).
[17] Homestore, Inc. v. Tafeen, 888 A.2d 204, 217 (Del.2005).
[18] Levitt v. Bouvier, 287 A.2d 671, 673 (Del. 1972).
[19] Unocal Corp. v. Mesa Petroleum Co., 493 A.2d at 955 (citing Cheff v. Mathes, 199 A.2d at 554-55).
[20] Unocal Corp. v. Mesa Petroleum Co., 493 A.2d at 955.
[21] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1387.
[22] Id. at 1387 (citing Paramount Communications, Inc. v. Time, Inc., 571 A.2d at 1154-1155 (Del. 1990)). There are no allegations contended that the NOL Poison Pill, the Exchange, and the Reloaded NOL Poison Pill are coercive.
[23] Carmody v. Toll Bros., Inc., 723 A.2d 1180, 1195 (Del.Ch.1998)(quoting Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1389).
[24] According to Professor Ferrell, the free rider problem is that, even if an investor believes that replacing the board would result in a material benefit to shareholders, the investor has to bear the full cost of a proxy fight while only receiving her proportionate fraction of the benefit bestowed upon shareholders. Professor Ferrell testified that, along with the reduced likelihood of success at a 5% position, the capped position would mean that the challenger would be unable to internalize more of the benefits by increasing her share ownership.
[25] Moran v. Household Int'l, Inc., 500 A.2d 1346, 1356 (Del.1985).
[26] Id. at 1355.
[27] Id.
[28] Id. This Court additionally noted that "many proxy contests are won with an insurgent ownership of less than 20%," and that "the key variable in proxy contest success is the merit of an insurgent's issues, not the size of his holding." Id.
[29] Coates' Report at 11 (citing Simpson Thacher & Bartlett, LLP, Client Memo: Rights Plans Offer Special Benefits for Companies Whose Market Capitalization Has Declined to $500 Million or Below (2009), available at www.stblaw.com/content/Publications/ pub795.pdf and RiskMetrics Group, U.S. Proxy Guidelines Concise Summary (Digest of Selected Key Guidelines)(2009), www. riskmetrics.com/sites/default/files/2009 RMGUSPolicyConciseSummaryGuideline. pdf).
[30] Id.
[31] There were eight such contests at micro-cap companies in which the challenging shareholder held less than 4.99% of the outstanding shares. Challengers prevailed in six of these contests, including at three companies that had classified boards.
[32] Trilogy rejects Selectica's position that due to the concentrated shareholder base, one could simply pick up the phone and call the shareholders, because Steel Partners, Director Sems, and Lloyd Miller owned 23.5% of Selectica's stock at the time. Thus, their opposition would result in having to conduct a traditional proxy contest. However, twenty-two shareholders own a combined 62% of the stock. If the 23.5% owned by Steel Partners, Sems, and Miller are subtracted from 62%, that leaves 38.5% of Selectica owned by nineteen shareholders. Those nineteen shareholders plus the 4.99% amount allowed before triggering the pill would equal 43.49% of Selectica's shares, an amount slightly in excess of what Harkins testified would be needed to win a proxy contest.
[33] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1383.
[34] Id.
[35] Del.Code Ann. tit. 8, § 141(d) (2010).
[36] MM Companies, Inc. v. Liquid Audio, Inc., 813 A.2d 1118, 1122 (Del.2003) (citing Lucian Arye Bebchuk, John C. Coates, IV & Guhan Subramanian, The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy, 54 Stanford L.Rev. 887 (2002)). See also Martin Lipton, Pills, Polls and Professors Redux, 69 U. Chi. L.Rev. 1037, 1059 (2002), & John C. Coates IV, Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence, 79 Tex. L.Rev. 271, 328-29 (2000).
[37] Carmody v. Toll Bros., Inc., 723 A.2d at 1186 n. 17 (emphasis added).
[38] In re Gaylord Container Corp. Shareholders Litig., 753 A.2d 462, 482 (Del.Ch.2000).
[39] Moran v. Household Int'l, Inc., 500 A.2d at 1357.
[40] Id. at 1356 (emphasis added).
[41] We note that Selectica no longer has a classified Board. After trial, the Selectica Board amended its charter to eliminate its staggered board structure. On October 15, 2009 the Court of Chancery granted Trilogy's Second Motion for Judicial Notice, which requested the court to take judicial notice of the Selectica proxy statement that referenced the foregoing charter amendment eliminating the staggered board terms.
[42] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1388 (quoting Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34, 45-46 (Del. 1994)).
[43] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1387 (citing Gilbert v. El Paso Co., 575 A.2d 1131, 1145 (Del. 1990)).
[44] Del.Code Ann. tit. 8, § 141(e) (2010).
[45] Homestore, Inc. v. Tafeen, 888 A.2d at 217.
[46] Levitt v. Bouvier, 287 A.2d at 673.
[47] Unocal Corp. v. Mesa Petroleum Co., 493 A.2d at 955.
[48] See, e.g., Moran v. Household Int'l, Inc., 500 A.2d at 1354.
[49] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1384.
[50] Moran v. Household Int'l, Inc., 500 A.2d at 1357.
[51] Id. at 1354.
[52] Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d at 1378 (citing Moran v. Household Int'l, Inc., 500 A.2d at 1355 and Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 179 (Del. 1986)).
[53] Moran v. Household Int'l, Inc., 500 A.2d at 1357.
[54] Id. at 1354.
[55] Id.
[56] Id. at 1357.
[57] M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d 513, 527-28 (Del. 1999).
[58] Johnston v. Arbitrium (Cayman Islands) Handels, 720 A.2d 542, 546 (Del. 1998); see also Montgomery Cellular Holding Co., Inc. v. Dobler, 880 A.2d 206, 228 (Del.2005).
[59] Johnston v. Arbitrium (Cayman Islands) Handels, 720 A.2d at 546.
[60] Id.; Montgomery Cellular Holding Co., Inc. v. Dobler, 880 A.2d at 228.
[61] Dover Historical Society, Inc. v. City of Dover Planning Commission, 902 A.2d 1084, 1089 (Del.2006) (quoting Chavin v. Cope, 243 A.2d 694, 695 (Del.1968)).