# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE EDGIO, INC. STOCKHOLDERS
LITIGATION

)
)
)

CONSOLIDATED
C.A. No. 2022-0624-MTZ

## MEMORANDUM OPINION
Date Submitted: January 20, 2023
Date Decided: May 1, 2023

Gregory V. Varallo and Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Mark Lebovitch, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Jeremy Friedman and David Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York, *Attorneys for Plaintiffs*.

Rudolf Koch, Kyle H. Lachmund, John M. O'Toole, and Kevin M. Kidwell, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Deborah Birnbach and Tucker DeVoe, GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

After a period of struggle, a publicly traded telecommunications company caught the attention of an industry investor. The two negotiated a potentially lucrative strategic transaction in which the company acquired one of the investor's portfolio companies. The company paid for the acquisition in stock, issuing a 35% stake in the post-merger entity to the investor. In connection with the stock issuance, that entity and the investor entered into a stockholders' agreement that restricted the investor's voting and transfer rights.

Two company stockholders challenge certain provisions of that stockholders' agreement. Those stockholders argue the challenged terms comprise defensive measures that create a significant and enduring stockholder block designed to entrench the board and protect it from stockholder activism. They are particularly concerned with a restriction on selling or transferring any shares to any entrant on a particular list of the fifty "most significant" activist investors. They have asked this Court to review the challenged provisions with enhanced scrutiny and enjoin the challenged provisions' enforcement.

The defendants point out that the majority of the company's stockholders have already reviewed and approved the stock issuance. The defendants submit that the decision to recommend the issuance, and the negotiation and entry into the terms of

2

the stockholders' agreement, are subject to deferential business judgment review under *Corwin v. KKR Financial Holdings LLC*.[1]

But the claim here—a claim to enjoin enduring alleged entrenchment devices—is not a type of claim that *Corwin* was designed to cleanse. In *Corwin*, our Supreme Court held a stockholder vote could cleanse a post-closing claim for damages, even if enhanced scrutiny under *Revlon* was warranted.[2] Emphasizing that holding was limited to claims seeking monetary relief, our Supreme Court explained the ruling would not "impair the operation of *Unocal*" in its core function of elevating scrutiny for claims for injunctive relief.[3] Additionally, the Court declined to engage with or overturn earlier precedent that has been read to preclude a stockholder vote from cleansing a claim for injunctive relief subject to *Unocal* enhanced scrutiny. Applying *Corwin* to such claims would not serve its underlying policy rationale of allowing stockholders to make free and informed choices based on the economic merits of a transaction. Rather, our law has consistently recognized that the harm caused by entrenching measures is irreparable and evades economic valuation. I interpret *Corwin* to stop short of cleansing claims seeking to enjoin defensive measures.

---

[1] 125 A.3d 304 (Del. 2015).

[2] *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[3] *Corwin*, 125 A.3d at 312.

Having concluded stockholder approval does not operate to invoke the business judgment rule, the final step of the analysis considers if the plaintiffs have pled facts warranting enhanced scrutiny under *Unocal*. I conclude they have. In circumstances like these, where the defensive measures are not of a sort that per se warrant enhanced scrutiny, *Unocal* applies where a plaintiff has pled facts supporting a reasonable inference that a board acted defensively in response to a perceived threat. Here, the complaint pleads that the company experienced a significant drop in its stock price, that it was missing analyst earnings estimates and lowering its earnings guidance, and—up until six months before the challenged provisions were agreed upon—that analysts were speculating the company may be an activist target. These circumstances, coupled with the defensive nature of the challenged provisions and in particular the bar on transferring shares to anyone on the list of activists, supports the plaintiff-friendly inference that the board negotiated for and obtained those provisions to defend against a perceived threat of stockholder activism.

Enhanced scrutiny under *Unocal* applies. The defendants do not argue that they have satisfied their burden under *Unocal*. Their motion to dismiss is denied.

## I.    BACKGROUND[4]

Limelight Network, Inc. ("Limelight" or the "Company") provides network service for delivery of digital media content and software.  Limelight's stock price reached an all-time high of $8.19 per share in July 2020, but its fortune fell:  by January 2021, Limelight's stock price had declined by over 47%, "closing at $4.33 per share on January 20."[5]  The Company hired a new CEO, Bob Lyons, in January 2021, yet its financial performance continued to slide.  On February 11, the Company announced fourth quarter 2020 results showing a year-over-year decline in revenue, causing Limelight's stock price to drop another 13%, closing at $3.95 on

---

[4] I draw the following facts from plaintiff George Assad's Verified Class Action Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).  Citations in the form of "Kidwell Aff. —" refer to the exhibits attached to the Transmittal Affidavit of Kevin M. Kidwell, Esquire in Support of Defendants' Opening Brief in Support of Their Motion to Dismiss the Verified Complaint available at D.I. 26 (the "Kidwell Affidavit").  Citations in the form of "8-K —" refer to the Company's Form 8-K filed March 6, 2022, attached as Exhibit A to the Kidwell Affidavit.  Citations in the form of "Proxy — " refer to the Company's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed May 4, 2022, attached as Exhibit B to the Kidwell Affidavit.  Citations in the form of "SPA" refer to the Stock Purchase Agreement by and between Limelight Networks, Inc. and College Parent, L.P., dated March 6, 2022, attached as Exhibit C to the Kidwell Affidavit.  Citations in the form of "S'holders' Agr. —" refer to the Stockholders Agreement between Limelight Networks Inc. and College Top Holdings, Inc., dated June 15, 2022, attached as Exhibit D to the Kidwell Affidavit.  In adjudicating this motion to dismiss, the Court may consider these sources, as well as other publicly filed documents regarding the allegations in the Verified Class Action Complaint.  *See Orman v. Cullman*, 794 A.2d 5, 15–16 (Del. Ch. 2002); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[5] Compl. ¶ 29.

February 12.  On April 29, the Company announced its first quarter earnings showing a greater per-share loss than forecasts estimated.  The Company's shares dropped another 7%.  That spring, the Company implemented a turnaround plan "designed to simultaneously address short-term headwinds and to position [it] to achieve near- and long-term success."[6]  The Company also "retained AlixPartners LLP, a financial advisory and consulting firm best known for turnaround work, which was 'digging into every facet of [the] company.'"[7]  Nevertheless, the Company's second quarter earnings again missed analysts' forecasts.  Analysts remained neutral on the turnaround plan; the Company lowered its own guidance in its third quarter earnings report in November.

Market commentators and analysts speculated Limelight may be a target for activist investors.  In an article dated March 12, *The Deal* highlighted Limelight's struggles, noted the potential for an activist intervention, and began including Limelight in its weekly "The Crosshairs" list, which includes its "top 10 potential activist targets."[8]  On March 19, an investment bank issued a report echoing this speculation, noting Limelight was "a potential activist target, given the transition

---

[6] Limelight Networks, Quarterly Report (Form 10-Q), at 22 (April 30, 2021).

[7] Compl. ¶ 34.

[8] *Id.* ¶¶ 32–33.

6

and leadership turnover, especially at the cheap multiple."[9]  No activist investors emerged.

Instead, Limelight was approached by Apollo Global Management, Inc.  On June 27, Apollo's financial advisor RBC Capital Markets, LLC contacted Lyons to express Apollo's interest in a potential combination of Limelight and one of Apollo's investments, Edgecast, Inc.  Edgecast, a business unit of Yahoo, Inc., offered "leading set of solutions across content delivery, cloud security, and video streaming."[10]  Yahoo's parent company, College Parent, L.P., was 90% owned by Apollo affiliate funds and 10% owned by Verizon Communications, Inc.[11]

Limelight conducted due diligence on Edgecast from July through October of 2021.  On December 21, Limelight's board of directors (the "Board") sent College Parent a proposed term sheet offering to acquire Edgecast for Limelight common stock worth approximately $300 million, with the possibility for additional stock-based earnout consideration of $100 million.[12]  On December 24, College Parent sent a revised term sheet, which included terms for corporate governance rights in the combined company after closing.  The parties continued to exchange term sheets

---

[9] *Id.* ¶ 34 (emphasis omitted).

[10] Proxy at 10.

[11] Compl. ¶ 6; Proxy at 1.

[12] Proxy at 52–53.

and negotiate governance rights, "as well as stock transfer restrictions for College Parent."[13]

Limelight and College Parent executed a nonbinding term sheet dated January 6, 2022, reflecting the December 21, 2021, proposed price.[14] The parties continued to exchange drafts of the purchase agreement and other related agreements, including a stockholders' agreement governing College Parent's rights after closing.

On March 6, 2022, the Limelight Board met to discuss the proposed transaction with College Parent (the "Acquisition").[15] After Goldman Sachs delivered an oral opinion that the Acquisition was fair to Limelight's stockholders, the Board approved and adopted the purchase agreement "and the transactions contemplated thereby."[16] The parties executed the purchase agreement the same day.[17] The executed purchase agreement contemplated that Limelight would purchase all of Edgecast's issued and outstanding common stock as well as certain related businesses and assets. At or around the time of the closing, Limelight would

---

[13] Compl. ¶ 41.

[14] Proxy at 53.

[15] *Id.* at 55.

[16] *Id.*

[17] *Id.*

change its name to Edgio, Inc.[18]   As consideration, Limelight would issue approximately 71.9 million shares of its common stock to College Parent, worth approximately $300 million.  The agreement also included an earnout tied to the post-closing entity's stock price, pursuant to which College Parent could receive up to an additional 12.7 million Company shares, worth approximately $100 million.  Immediately after the closing, College Parent would hold approximately 35% of the combined company's outstanding stock.  The Company announced the Acquisition in a press release on March 7.  Following that announcement, *The Deal* reported that "Apollo could serve as a white squire if activists pursue Limelight."[19]

As part of the Acquisition, College Parent entered into a stockholders' agreement with the Company (the "Stockholders' Agreement").  The Stockholders' Agreement expanded the post-closing entity's board of directors from eight to nine directors, with two Limelight directors resigning and College Parent filling the three open Board seats.[20]

The Stockholders' Agreement also sets forth College Parent's governance rights in the Company and other rights and limitations accompanying its Company

---

[18] *Id.* at 50.

[19] Compl. ¶ 49.  "A 'white squire' is an investor that acquires a significant stake in a target company to prevent a hostile takeover and/or increase the incumbent's chance of prevailing in a proxy contest."  *Id.*

[20] *Id.* ¶ 8; S'holders' Agr. § 2.1(a).

stock.[21]  It contains a standstill provision precluding it from purchasing additional Company stock, among other things, which the plaintiffs do not challenge "except to the extent it is entwined" with other provisions they do challenge.[22]  Among other things, the standstill states College Parent may not "seek the removal of any member of the Board, or otherwise act, alone or in concert with others, to seek representation or to control or influence the management, the Board or policies of the Company," or "otherwise act, alone or in concert with others, to seek to control or influence the management or the policies of the Company."[23]  The standstill remains in place until "College Parent and its affiliates cease to beneficially own at least 35% of Limelight common stock issued at closing."[24]

Three provisions of the Stockholders' Agreement are at issue in this litigation. First, College Parent must vote in favor of the Board's recommendations with respect to director nominations and against any nominees not recommended by the Board (the "Director Voting Provision").[25]  Second, for other non-routine matters submitted for a stockholder vote, College Parent must either vote in favor of the Board's recommendation or pro rata with all other Company stockholders (the "Vote

---

[21] *See* S'holders' Agr.

[22] *Id.* § 4.2(a); Compl. ¶¶ 10, 61.

[23] S'holders' Agr. § 4.2(d), (g).

[24] Proxy at 87; S'holders' Agr. § 4.2.

[25] S'holders' Agr. § 3.1(a).

Neutralization Provision").[26] The Director Voting Provision and the Vote Neutralization Provision remain in place so long as College Parent owns at least 35% of the stock issued to it at the Acquisition's closing.

Third, College Parent is restricted for two years from transferring its shares unless it first obtains the Board's written consent, or unless the transfer is in connection with a third party tender offer, business combination, or other similar transaction that is recommended by the Board.[27] After those two years, College Parent is prohibited from transferring its shares to a Company competitor or any investor on the most recently published "SharkWatch 50" list for twelve months.[28] I will refer to the transfer restrictions imposed on College Parent for these thirty-six months as the "Transfer Restrictions."

Upon reaching its agreement with College Parent, the Company filed an 8-K disclosing the Acquisition, dated March 7, 2022. The 8-K included a summary of the key terms of the deal, as well as a general description of the Stockholders'

---

[26] *Id.* § 3.1(b). "Non-routine" matters include everything other than "the election of directors, the approval (on a non-binding basis) of the compensation of the Company's named executive officers and all other business involving compensation matters (including new or amended equity plans), and the ratification of the appointment of the Company's independent auditors." *Id.* at 3 (defining "Routine Matters").

[27] S'holders' Agr. § 4.1(a)(iii)–(iv). There are other limited exceptions not relevant here.

[28] *Id.* § 4.2(b). The SharkWatch 50 list is "a compilation of the 50 most significant activist investors." Compl. ¶ 59.

11

Agreement.[29]  The summary of the Stockholders' Agreement included a discussion of some of College Parent's governance and voting rights post-closing.[30]  The Stockholders' Agreement was attached to the 8-K.

To complete the Acquisition, the Company was required to obtain stockholder approval for the stock issuance.[31]  In advance of that vote, Limelight issued a proxy statement dated May 4, 2022 (the "Proxy"), seeking approval of the issuance of Limelight common stock to provide for the purchase of all outstanding Edgecast shares, and explaining that the Acquisition could not be completed if the stockholders did not approve the issuance.[32]  The Proxy summarized the Acquisition, including the Stockholders' Agreement.[33]  The Proxy also described the terms of the standstill and Transfer Restrictions.[34]  The Proxy incorporated by reference the 8-K

---

[29] 8-K at Item 1.01, at *Stock Purchase Agreement & Stockholders' Agreement*.

[30] *Id.* at *Stockholders' Agreement*.

[31] Proxy at 48.  The Proxy disclosed that this requirement is imposed by the NASDAQ rules, which require stockholder approval any time a company issues stock equally 20% or more of its outstanding shares in connection with an acquisition.  *Id.*  The Company and College Parent included stockholder approval of the deal as a condition to closing.  SPA art. IX § 9.1(c).

[32] Proxy at 48–49 ("Stockholder approval of the stock issuance proposal is a condition to completion of the transaction pursuant to the purchase agreement.  If our stockholders do not approve the stock issuance proposal, we will be unable to consummate the transaction and the purchase agreement may be terminated by us or College Parent.").

[33] *Id.* at 50, 86–89.

[34] *Id.* at 86–88.

and Stockholders' Agreement attached to it, and encouraged stockholders to read the Stockholders' Agreement.[35]

On June 9, Limelight stockholders voted in favor of the stock issuance to pay for the Acquisition. The Acquisition closed on June 15.[36] At closing, the Company and College Parent entered into the Stockholders' Agreement.[37] As provided in the Stockholders' Agreement, the Board expanded from eight to nine directors, with three new College Parent appointees joining the Board and two Limelight directors resigning.

Plaintiffs and Company stockholders George Assad and Dianne Botelho (together, "Plaintiffs") each filed a class action complaint on July 18.[38] The Plaintiffs stipulated to consolidation, and determined that Assad's complaint would serve as the operative complaint (the "Complaint").[39] The Complaint asserts a single count: a direct claim for breach of fiduciary duty against Company directors Lyons, Walter D. Amaral, Doug Bewsher, Scott A. Genereux, Patricia Parra Hadden, and

---

[35] *Id*. at 86, 170.

[36] Edgio, Inc., Current Report (Form 8-K) (June 16, 2022).

[37] *Id.* at Item 1.01.

[38] D.I. 1; *Botelho v. Amaral*, C.A. No. 2022-0626-MTZ, D.I. 1 (Del. Ch. July 18, 2022).

[39] D.I. 8.

David C. Peterschmidt (together, the "Director Defendants", and with defendant Edgio, "Defendants").[40]

Plaintiffs claim the Director Defendants "breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Acquisition and the Stockholders' Agreement, which they used to entrench themselves."[41] But Plaintiffs agree that the Acquisition itself was a boon to the Company, and do not challenge most of the Stockholders' Agreement, including the standstill. Rather, they focus on the Challenged Provisions, asserting the Director Defendants included them to interfere with the stockholder franchise or entrench themselves. Plaintiffs contend the Challenged Provisions establish a 35% voting bloc contractually committed to protecting the Board and deter and defeat any activist threats to the incumbent directors. They ask the Court to enjoin the enforcement of the Challenged Provisions, but do not seek damages.[42]

---

[40] Compl. ¶¶ 77–82. Plaintiffs did not assert claims against the two former Company directors who resigned upon the Acquisition closing.

[41] *Id.* ¶ 80.

[42] *Id.* ¶ 82, Prayer for Relief. Plaintiffs have not stated that they seek monetary damages in their briefing or at oral argument. Even when faced with Defendants' argument that Plaintiffs' claim should be dismissed to the extent it seeks monetary damages, Plaintiffs still did not argue they brought this action seeking damages. Rather, they argued that "the Court should reject Defendants' baseless request that the Court prematurely curtail its broad equitable powers to fashion an appropriate remedy upon the establishment of a fiduciary breach." D.I. 29 at 64. I interpret Plaintiffs' claim as one for injunctive relief, and not for damages.

On September 2, Defendants filed a motion to dismiss the Complaint (the "Motion").[43] Defendants argue the Court must dismiss the Complaint because the Board's decisions concerning the Challenged Provisions are protected by the business judgment rule and enhanced scrutiny is not triggered under *Unocal Corporation v. Mesa Petroleum Company* in the absence of a threat and defensive action.[44] Additionally, Defendants argue that even if enhanced scrutiny does apply, the Court must dismiss the Complaint under *Corwin v. KKR Financial Holdings LLC* because a fully informed, uncoerced majority of the Company's stockholders approved the stock issuance for the Acquisition, of which the Stockholder's Agreement was an integral part, cleansing any alleged breaches of fiduciary duty and restoring business judgment review.[45] The parties fully briefed the Motion[46] and the Court heard oral argument on October 12.[47]

On December 8, I asked the parties for supplemental briefing "on the specific question of whether this type of claim—a post-close claim to enjoin enduring entrenchment devices—is a claim that *Corwin* can or is intended to cleanse."[48] The

---

[43] D.I. 24.

[44] 493 A.2d 946 (Del. 1985).

[45] 125 A.3d 304 (Del. 2015).

[46] D.I. 25; D.I. 29; D.I. 32.

[47] D.I. 38; D.I. 39.

[48] D.I. 40.

parties submitted simultaneous opening and answering supplemental briefs, with the

last briefs filed on January 20, 2023.[49]

## II. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule

12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[50]

Thus, the touchstone "to survive a motion to dismiss is reasonable

'conceivability.'"[51] This standard is "minimal"[52] and "plaintiff-friendly."[53] "Indeed,

it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his

claims at a later stage of a proceeding, but that is not the test to survive a motion to

dismiss."[54] Despite this forgiving standard, the Court need not "accept conclusory

---

[49] D.I. 43; D.I. 44; D.I. 46; D.I. 47.

[50] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[51] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[52] *Id.* at 536.

[53] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)).

[54] *Cent. Mortg.*, 27 A.3d at 536.

allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[55] "Moreover, the court 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'"[56]

### A. *Corwin* Cannot Cleanse A Claim Seeking To Enjoin Defensive Measures Under *Unocal* Review.

There is "little utility in a judicial examination of the fiduciary actions ratified by stockholders," so I begin with Defendants' reliance on *Corwin*.[57] *Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders."[58] As this Court has explained:

> [*Corwin*] stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule.[59]

---

[55] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[56] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *4 (Del. Ch. July 24, 2009) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[57] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *2 (Del. Ch. May 31, 2017).

[58] *Corwin*, 125 A.3d at 309.

[59] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021).

To obtain the protection of *Corwin*'s presumption, Defendants must "demonstrate that the '[Acquisition] has been approved by a fully informed, uncoerced majority of the disinterested stockholders.'"[60] But our courts have not clearly resolved the question of whether *Corwin* can apply to a claim governed by *Unocal* and seeking injunctive relief. A careful reading of *Corwin*'s text and other authorities compels the conclusion that *Corwin* was not intended to cleanse a claim to enjoin a defensive measure under *Unocal* enhanced scrutiny.

### 1. *Unocal* Enhanced Scrutiny Is Meant For Requests To Enjoin Defensive Measures.

"Framed generally, enhanced scrutiny requires that the fiduciary defendants 'bear the burden of persuasion to show that their motivations were proper and not selfish' and that 'their actions were reasonable in relation to their legitimate objective.'"[61] It applies in "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[62] *Unocal* enhanced scrutiny is a product of the hostile takeover wave of

---

[60] *Chester Cty. Empl. Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019) (quoting *Corwin*, 125 A.3d at 306).

[61] *Firefighters' Pension Sys. of City of Kansas City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021) (quoting *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007)).

[62] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013).

the 1980s.[63] It was conceived of as a method to police the inherent conflict present when a board resolves to oppose a takeover bid.[64] As our Supreme Court put it: "Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred."[65] In its original context, *Unocal* claims were brought when a board actively opposed a hostile

---

[63] *See Williams v. Geier*, 671 A.2d 1368, 1377 (Del. 1996) ("*Unocal* is a landmark innovation of the dynamic takeover era of the 1980s."); Charles R. Korsmo, *Delaware's Retreat from Judicial Scrutiny of Mergers*, 10 UC Irvine L. Rev. 55, 89 (2019) ("Managers want to keep their jobs and the accompanying perquisites. In the event of a takeover, however, the new owners would boot them out of office. As a result, they may be willing to spurn an offer that would be beneficial to the stockholders. This was a dominant concern in the 1980s merger cases, including *Unocal* and *Revlon*, at a time of heated debate over the rise of leveraged buyouts, hostile takeovers, and the market for corporate control."); *Unocal*, 493 A.2d 946 (evaluating defensive response to a hostile tender offer); *see also Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995) ("The ultimate question in applying the *Unocal* standard is: what deference should the reviewing court give 'to the decisions of directors in defending against a takeover?'" (quoting *E. Norman Veasey, The New Incarnation of the Business Judgment Rule in Takeover Defenses*, 11 Del. J. Corp. L. 503, 504–05 (1986)); *City Cap. Assocs. Ltd. P'ship v. Interco Inc.*, 551 A.2d 787, 796 (Del. Ch. 1988) (referring to *Unocal* as "the most innovative and promising case in our recent corporation law").

[64] *See Unocal*, 493 A.2d at 954–55.

[65] *Id.* at 954.

takeover bid, or the prospect of one, often by enacting a rights plan.[66] The suits sought to enjoin the defensive measures.[67]

Since *Unocal* was conceived of nearly forty years ago, hostile tender offers have declined,[68] and the corporate world has seen the emergence and proliferation of the activist stockholder.[69] Activists use the threat of proxy contests to influence changes to board composition and corporate policy, among other things.[70] Underperforming or undervalued companies are particularly susceptible.[71] This

---

[66] *See, e.g.*, *Unitrin*, 651 A.2d 1361; *Moran v. Household Int'l, Inc.*, 500 A.2d 1346 (Del. 1985); *Unocal*, 493 A.2d 946; *see also* Marcel Kahan & Edward Rock, *Anti-Activist Poison Pills*, 99 B.U. L. Rev. 915, 927 (2019) (referring to hostile takeover bids as "the original context of *Unocal*").

[67] *See, e.g.*, *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1141–42 (Del. 1989).

[68] *See* Martin Lipton & Steven A. Rosenblum, *Election Contests in the Company's Proxy: An Idea Whose Time Has Not Come*, 59 Bus. Law. 67, 92 (2003) (noting the decline of hostile takeovers "at the end of the 1980s").

[69] *See* 1 Arthur Fleischer, Jr., et al., *Takeover Defense: Mergers and Acquisitions* §10.02[A], at 10-43 (9th ed. 2021) (noting "explosive growth of shareholder activism" in the 21st century); *id.* at 10-45 ("Today, boards recognize that the most likely proxy contest is one in aid of an activist campaign seeking changes in strategy, leadership, or governance, rather than by a bidder seeking to facilitate a takeover bid.").

[70] *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *30 (Del. Ch. Feb. 26, 2021) ("[A]ctivists' ability to replace directors through the stockholder franchise is the reason why boards listen to activists. Most activists hold far less than a hard majority of a corporation's stock, making the main lever at an activist's disposal a proxy fight."), *aff'd sub. nom. Williams Cos., Inc. v. Wolosky*, 264 A.3d 641 (Del. 2021) (TABLE); Kahan & Rock, *supra* note 66, at 918 & n.6 (explaining that activists are often successful in securing board representation or having a target adopt their proposals, and stating that "[a]ctivists often secure board seats with only the explicit or implicit threat of a proxy fight, without even filing any proxy materials").

[71] John C. Coffee, Jr. & Darius Palia, *The Wolf at the Door: The Impact of Hedge Fund Activism on Corporate Governance*, 41 J. Corp. L. 545, 556 (2016) ("[H]edge funds are 'offensive,' deliberately seeking out an underperforming target in which to invest in order

activist-rich climate has caused some companies that are or may become activist targets to take preventative, or defensive, steps.[72]  Through this shift, *Unocal* has endured and evolved:  board responses to activists have warranted *Unocal* scrutiny, and our courts have assigned no less importance to *Unocal*'s function when applied

---

to pursue a proactive agenda and change their target's business model."); Fleischer, et al., *supra* note 69 § 10.02[A], at 10-47 ("Historically, hedge fund activists targeted 'cash-rich,' diversified, or seriously underperforming companies."); *id.* at 10-48 (discussing "economic" or "value" activism, "which includes campaigns seeking . . . to improve a corporation's top and bottom lines through operational changes," among other things); 1 Martin Lipton & Erica H. Steinberger, *Takeovers & Freezeouts* § 1.01[8], at 1-12.8 (2009 update) ("Companies need to be acutely aware of where they stand in relation to their peers. Relatively poor performance, regardless of the reason, can make one an easy [activist] target."); Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1890 (2017) ("Although scholars are not in full agreement about how to characterize the companies targeted by hedge funds, with some calling them underperforming, and others calling them profitable companies undervalued by the market, some common characteristics have emerged." (citations omitted) (footnotes omitted)); *see also* Brando Maria Cremona & Maria Lucia Passador, *Shareholder Activism Today: Did Barbarians Storm the Gate?*, 20 U.C. Davis Bus. L.J. 207, 228 (2020) ("Regardless of the risk and return models, the study shows that the negative average monthly alpha for the 3 years before the event that is statistically significant at 1% (0,8% [sic] and 0.98% respectively), which implies that companies targeted by activists systematically underperformed the market in the medium-term prior to the event.").

[72] *See,* Fleischer, et al., *supra* note 69 § 10.02[A], at 10-44 to -45 ("The combination of concentrated ownership and the ever present threat of an activist campaign for the support of that concentrated ownership base means that companies must be in a state of constant vigilance.  As a result, rather than 'defensive preparedness; (*i.e.*, preparedness from unsolicited takeover bids for the company) boards of directors now emphasize 'activism preparedness' . . . .); Lipton & Steinberger, *supra* note 71 § 1.01[8], at 1-12.8 (describing an "environment of hedge fund activism," and cautioning that "[t]here is no substitution for vigilance and companies must carefully monitor analyst and media reports and ISS pronouncements, particularly for suggestions of strategic changes the company could make").

in furtherance of requests for injunctive relief outside of the M&A context.[73] *Unocal*'s flexibility is a feature, not a bug: the *Unocal* decision itself recognized the importance of our law growing and developing in response to a changing world.[74]

Unocal's flexibility has been tested by post-close claims for damages from directors. As Vice Chancellor Glasscock explained in *Ryan v. Armstrong*,

---

[73] *See, e.g.*, *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 599 (Del. 2010); *Moran*, 500 A.2d at 1350 (applying *Unocal* to the decision to adopt a pre-planned defensive mechanism); *Williams Cos.*, 2021 WL 754593, at *21–40; *Third Point LLC v. Ruprecht*, 2014 WL 1922029, at *1, 15 (Del. Ch. May 2, 2014); *see also Stroud v. Grace*, 606 A.2d 75, 82 (Del. 1992) ("The scrutiny of *Unocal* is not limited to the adoption of a defensive measure during a hostile contest for control.").

[74] *Selectica*, 5 A.3d at 599 ("In *Unocal*, this Court recognized that 'our corporate law is not static. It must grow and develop in response to, indeed in anticipation of, evolving concepts and needs.'" (quoting *Unocal*, 493 A.2d at 957); *see also Time*, 571 A.2d at 1153 ("The usefulness of *Unocal* as an analytical tool is precisely its flexibility in the face of a variety of fact scenarios.").

It is clear . . . that *Unocal* enhanced scrutiny is primarily a tool for this Court to provide equitable relief where defensive measures by directors threaten the stockholders' right to approve a value-enhancing transaction. In such a case, where directors cannot show that a defensive measure is reasonable, a plaintiff has satisfied the first, merits-based prong of an injunctive relief analysis. This permits the Court (where irreparable harm and balance in favor of relief are also shown) to impose injunctive relief to remove the unreasonable impediment to a transaction. In other words, enhanced scrutiny allows preliminary injunctive relief without a showing by the plaintiff that it is probable that a defendant has breached a fiduciary duty. The standard is modified, in the *Unocal* framework, because of the inherent motive for entrenchment where directors take measures to fend off a suitor.

How *Unocal* scrutiny applies in a damages action—especially in the face of an exculpatory provision where ultimately the plaintiff must demonstrate a breach of the duty of loyalty—is less clear.[75]

More recently, Vice Chancellor Laster gave voice to the essential concept that in considering a request for injunctive relief, enhanced scrutiny alone can give the Court reason to consider whether a transaction should be enjoined, but that when considering whether a fiduciary should be held liable, enhanced scrutiny must be coupled with proof that a fiduciary acted with nonexculpated self-interest, interestedness, or bad faith.[76]

---

[75] *Ryan v. Armstrong*, 2017 WL 2062902, at *9 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017).

[76] *Presidio*, 251 A.3d at 251–54 ("A court does not apply enhanced scrutiny when determining whether a fiduciary should be held liable."); *see also In re USG Corp*, 2020 WL 5126671, at *31 ("In order to avoid dismissal, a pleading from which I can merely infer an unreasonable sales process is not enough to overcome an exculpatory clause's protections; to survive, such pleading must reasonably imply breach of a non-exculpated duty.").

The foregoing demonstrates that regardless of the context, *Unocal*'s core function is, and has always been, providing a framework for evaluating whether an injunction should issue against defensive measures. And while our law does not clearly state the *Unocal* framework is inapplicable to damages actions, its application in that context is, at best, uncertain.

### 2. *Corwin* Restores The Business Judgment Rule In Damages Cases.

More enduring than *Unocal* is the principle that a stockholder vote can cleanse certain board actions.[77] The separation of ownership and control is a core feature of the corporate form, but the resulting agency relationship can present problems.[78] In

---

[77] *See, e.g., Stroud*, 606 A.2d at 82 ("Under Delaware law a fully informed shareholder vote in favor of a disputed transaction ratifies board action in the absence of fraud."); *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del. 1985) ("The settled rule in Delaware is that "where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail."" (quoting *Gerlach v. Gillam*, 139 A.2d 591, 593 (Del. Ch. 1958)); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 703 (Del. 1983) ("However, where corporate action has been approved by an informed vote of a majority of the minority shareholders, we conclude that the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority."); *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch. 1962) ("When the stockholders ratify a transaction, the interested parties are relieved of the burden of proving the fairness of the transaction."); *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (Del. 1952) ("We understand that where the board members vote themselves stock options and do not obtain stockholder ratification, they themselves have assumed the burden of clearly proving their utmost good faith and the most scrupulous inherent fairness of the bargain. Where there is stockholder ratification, however, the burden of proof is shifted to the objector.").

[78] *Park Emps'. & Ret. Bd. Emps'. Annuity & Benefit Fund of Chi. v. Smith*, 2016 WL 3223395, at *1 (Del. Ch. May 31, 2016), *aff'd sub nom. Park Emps'. & Ret. Bd. Emps'. Annuity & Benefit Fund of Chi. ex rel. BioScrip, Inc. v. Smith*, 175 A.3d 621 (Del. 2017).

contexts in which agency problems are likely present, judicial review is warranted.[79]

But our law recognizes that a stockholder vote, under the right circumstances, alleviates such agency problems and obviates the utility of judicial review.[80] "Delaware corporation law gives great weight to informed decisions made by an uncoerced electorate. When disinterested stockholders make a mature decision about their economic self-interest, judicial second-guessing is almost completely circumscribed by the doctrine of ratification."[81]

In their most recent iteration, these concepts are embodied in the landmark decision *Corwin v. KKR Financial Holdings*.[82] In *Corwin*, the plaintiff brought a claim seeking monetary damages based on alleged breaches of fiduciary duty in negotiating a stock-for-stock merger.[83] On appeal, our Supreme Court considered whether a fully informed, uncoerced vote of a majority of the company's disinterested stockholders precluded the application of the *Revlon* or the entire fairness standard of review.[84] The Supreme Court reasoned that it did, stating "the

---

[79] *See In re Merge Healthcare Inc.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017).

[80] *See Liberty Broadband*, 2017 WL 2352152, at *2.

[81] *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114–15 (Del. Ch. 2007) (footnote omitted).

[82] *Corwin*, 125 A.3d at 313 (stating that is "the long-standing policy of our law" to "avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves").

[83] *Id.* at 305–08.

[84] *Id.* at 308. The trial court noted the merger did not implicate *Revlon*; the appellant sought enhanced scrutiny for the first time on appeal. *See In re KKR Fin. Hldgs LLC S'holder*

25

effect of the uncoerced, informed stockholder vote [was] outcome-determinative" because it invoked the business judgment rule.[85]

In my view, several aspects of *Corwin* preclude its application to claims for injunctive relief under *Unocal*. Its plain text limits its holding to post-close damages claims and promises to leave untouched the roles of *Unocal* and *Revlon* in claims for injunctive relief. It also left untouched earlier Supreme Court precedent that appears to suggest stockholder votes cannot cleanse claims brought under *Unocal* seeking injunctive relief. And the policy rationales underpinning *Corwin* and the cases on which it relies do not justify extending *Corwin* cleansing to such claims. I will explain each of my observations in turn.

---

*Litig.*, 101 A.3d 980, 989 (Del. Ch. 2014) ("Enhanced judicial scrutiny under *Revlon* is not implicated in this action because the stock-for-stock merger involved widely-held, publicly traded companies. Thus, the business judgment rule presumptively applies." (footnote omitted)), *aff'd sub nom. Corwin*, 125 A.3d 305; *Corwin*, 125 A.3d at 308 & n.12. The appellant also raised for the first time on appeal that *Gantler v. Stevens* required that the vote be given no ratifying effect. *Corwin*, 125 A.3d at 311 (considering *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009)). Nonetheless, the Delaware Supreme Court took on the appellant's ratification argument, and concluded the analysis of whether *Revlon* applied "d[id] not matter" because "the effect of the uncoerced, informed stockholder vote [was] outcome-determinative." *Id.* at 308, 311. And *Unocal* was never in play in *Corwin*: only *Revlon* could have scaled the standard of review up to enhanced scrutiny. In my view, the Delaware Supreme Court's deliberate choice to consider the effect of the stockholder vote, and to address *Unocal*, commend my particular adherence to *Corwin*'s plain text: those words were written with the freedom to say precisely what that Court wanted to say, and no more or less.

[85] *Corwin*, 125 A.3d at 308.

The *Corwin* opinion emphasizes the claim before it sought damages after closing—not injunctive relief. The very first sentence reads:

> In a well-reasoned opinion, the Court of Chancery held that the business judgment rule is invoked as the appropriate standard of review *for a post-closing damages action* when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders.[86]

In relating the public policy behind the holding, *Corwin* explains that

> the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the *economic merits* of a transaction for themselves.[87]

The Delaware Supreme Court since reiterated in *Morrison v. Berry* that *Corwin* was born out of a "post-closing damages action," described its "doctrine" in those terms, and cautioned in the next breath that "[c]areful application of *Corwin* is important due to its potentially case-dispositive impact."[88]

*Corwin* also made clear that its holding was not meant to "impair the operation of *Unocal* and *Revlon*, or expose stockholders to unfair action by directors without protection."[89] The Supreme Court suggested that applying *Unocal* or *Revlon* doctrines to a post-closing damages claim exceeded their original purpose and

---

[86] *Id.* at 305–06 (emphasis added).

[87] *Id.* at 312–13 (emphasis added); *see also id.* at 314 (referencing stockholders' "economic stake in the outcome").

[88] *Morrison v. Berry*, 191 A.3d 268, 274 (Del. 2018).

[89] *Corwin*, 125 A.3d at 312 (footnote omitted).

purview: "*Unocal* and *Revlon* are primarily designed to give stockholders and the Court of Chancery the tool of injunctive relief to address important M & A decisions in real time, before closing. They were not tools designed with post-closing money damages claims in mind."[90] Thus, *Corwin* made clear that its function in post-close damages actions did not impair *Unocal*'s core function of enabling consideration of injunctive relief against entrenching board actions, and that it should not be applied in a manner that interferes with that core function.[91]

*Corwin* also declined to engage in a "debate" over the role or fate of *In re Santa Fe Pacific Corporation Shareholder Litigation*,[92] a case that plausibly supports the proposition that a stockholder vote cannot cleanse a *Unocal* or *Revlon* claim seeking injunctive relief.[93] There, the operative claims, brought after a merger with the board's preferred bidder closed, alleged the board took unreasonable and disproportionate defensive measures to deflect another bidder.[94] *Santa Fe* held that

---

[90] *Id.*

[91] *Id.*; *see also Armstrong*, 2017 WL 2062902, at *9 (citing *Corwin*, 125 A.3d at 312).

[92] 669 A.2d 59 (Del. 1995).

[93] *See Corwin*, 125 A.3d at 311 n.20; J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1476–77 (2014) ("Under *Santa Fe*, it would appear that enhanced scrutiny will continue to apply 'at the pleading stage,' notwithstanding a fully informed stockholder vote. . . . As long as [*Santa Fe*] remain[s] good law, the case stands as an apparent impediment to the view that a fully informed stockholder vote on a merger otherwise subject to enhanced scrutiny causes the transaction to be reviewed under the business judgment rule." (quoting *Santa Fe*, 669 A.2d at 73)).

[94] *Santa Fe*, 669 A.2d at 65.

28

in voting on the merger, the stockholders did not vote in favor of those defensive measures, and so the Delaware Supreme Court "decline[d] to find ratification."[95] The Court reasoned that the alleged defensive measures coerced the very vote that would have ratified those defensive measures, and that the stockholders were not asked to ratify those defensive measures, so the vote could not serve that function.[96] The Delaware Supreme Court reached that holding after considering the broad "underlying purposes" of the *Revlon* and *Unocal* doctrines.[97]  The Court reflected, "The *Unocal* standard of enhanced judicial scrutiny rests in part on an 'assiduous . . . concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders'"; reiterated that *Unocal* "recognize[s] the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise"; and reminded us that "the judiciary must recognize the special import of protecting the shareholders' franchise within *Unocal*'s requirement that any defensive measure be proportionate and reasonable in relation to the threat posed."[98]  From there, the Court reasoned:  "Permitting the vote of a majority of stockholders on a merger to remove from judicial scrutiny unilateral Board action in

---

[95] *Id.* at 68.

[96] *Id.*; *see* Laster, *supra* note 93 at 1471–77 ("The Delaware Supreme Court has never explicitly called into question, much less overruled these aspects of *Santa Fe*.").

[97] *Santa Fe*, 669 A.2d at 67.

[98] *Id.* at 67–68 (first alteration in original) (internal quotation marks omitted) (quoting *Unitrin*, 651 A.2d at 1378–79)).

a contest for corporate control would frustrate the purposes underlying *Revlon* and *Unocal*."[99]  The Court concluded the allegations in the complaint triggered enhanced scrutiny and the board's obligation "to justify their decisionmaking."[100]  I read *Corwin*'s declination to engage with *Santa Fe* to preserve its statements about the importance of the "purposes underlying" *Unocal* when deciding whether ratification is available.[101]

More broadly, the rationale underlying *Corwin*—that the business judgment rule should apply when stockholders "have had the free and informed chance to decide on the *economic merits* of a transaction for themselves"—is not served in the context of a *Unocal* claim seeking to enjoin an enduring entrenchment device.[102]  *Corwin* explains that conduct supporting a post-closing claim for damages can be cleansed by stockholders who were satisfied with the economic value they received in a transaction.  Inequities in a transaction's price or process are compensable by

---

[99] *Id.* at 68.

[100] *Id.* at 72.

[101] *Id.* at 68 ("Permitting the vote of a majority of stockholders on a merger to remove from judicial scrutiny unilateral Board action in a contest for corporate control would frustrate the purposes underlying *Revlon* and *Unocal*."); *see also In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659, at *6 (Del. Ch. Apr. 13, 2017) (declining to "address the apparent tension between *Corwin* and *Santa Fe*" because it was "apparent from the face of the Complaint and documents incorporated therein that the provisions challenged here do not constitute an unreasonable deal protection device").

[102] *Corwin*, 125 A.3d at 312–13 (emphasis added).

monetary damages,[103] and therefore able to be cleansed by stockholders satisfied

with the consideration they already received.[104] But *Unocal* scrutiny is inspired by

concerns that directors may act to "thwart the essence of corporate democracy by

[103] *See, e.g.*, *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *45 (Del. Ch. Mar. 15, 2023) ("As a remedy for their sale-process claim, Plaintiffs seek damages from Stollmeyer in the amount that Vista would have paid, which Plaintiffs peg at $40 per share. The lost-transaction theory of damages finds firm footing in Delaware law."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved. Under those circumstances, the appropriate remedy can be a 'fairer' price or an award of rescissory damages." (footnote omitted)), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (Del. Ch. Aug. 27, 2015) ("Under these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty. This decision holds Murdock and Carter jointly and severally liable for damages of $148,190,590.18, representing an incremental value of $2.74 per share."); *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 214, 226 (Del. Ch. 2014) (awarding damages of $4.17 per share based on quasi-appraisal remedy for claim that the defendants made "decisions that fell outside the range of reasonableness during the process leading up to the Merger and when approving the Merger" and for a disclosure-related claim).

[104] *See Corwin*, 125 A.3d at 306 (addressing claims for damages relating to the negotiation and approval of a transaction); *see also In re Massey Energy Co. Deriv. & Class Action Litig.*, 160 A.3d 484, 507 (Del. Ch. 2017) ("The Complaint does not challenge the economic merits of the Merger itself. It is not alleged, for example, that the Massey directors played favorites with any bidder, erected improper defensive measures, or otherwise failed to maximize value for the Company's stockholders once a decision was made to consider strategic alternatives."); *Liberty Broadband*, 2017 WL 2352152, at *21 (referring to the "failure to run an informed sales process" and "negotiation by self-interested fiduciaries" as "[b]reaches of duty inherent in [a] transaction" and therefore subject to cleansing by a stockholder vote).

disenfranchising shareholders,"[105] which prototypically causes irreparable injury.[106]

Because a dollar value cannot be affixed to the harm caused by unjustifiably entrenching actions, it cannot be said that a stockholder can consider wrongfully entrenching actions as part of the "economic merits" of a transaction.[107]

Declining to extend the cleansing effects of a stockholder vote to action giving rise to a *Unocal* claim puts such claims on par with other types of irreparable injuries

---

[105] *Santa Fe*, 669 A.2d at 67 ("The *Unocal* standard of enhanced judicial scrutiny rests in part on an 'assiduous . . . concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders.'" (alteration in original) (quoting *Unitrin*, 651 A.2d at 1378)).

[106] *Higgin v. Albence*, 2022 WL 4239590, at *29 (Del. Ch. Sept. 14, 2022) ("This Court frequently finds actions by boards of directors that threaten the voting franchise for stockholders as constituting irreparable harm."), *aff'd in part, rev'd in part on other grounds*, 285 A.3d 840 (Del. 2022); *Pell v. Kill*, 135 A.3d 764, 793 (Del. Ch. 2016) (reasoning that "pre-ordaining the results of" an annual meeting "deprive[d] stockholders of their right to vote," and that "[t]his loss of voting power constitutes irreparable injury" (internal quotation marks omitted) (quoting *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987)); *Third Point*, 2014 WL 1922029, at *24 (reasoning the loss of a proxy contest because of a rights plan constitutes irreparable injury); *see also EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm."); *Unitrin*, 651 A.2d at 1378 ("This Court has been and remains assiduous in its concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders."); *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("In our view, those conclusions amount to a finding that management has attempted to utilize the corporate machinery and the Delaware Law for the purpose of perpetuating itself in office; and, to tht [sic] end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. These are inequitable purposes, contrary to established principles of corporate democracy.").

[107] *Corwin*, 125 A.3d at 312–13 ("[W]hen a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.").

incapable of being cleansed by *Corwin*, albeit through different doctrinal routes. For example, our Court often views the injuries flowing from material omissions in a proxy statement to be irreparable:[108] such omissions preclude cleansing because a fully informed vote is a prerequisite to *Corwin* applying in the first place.[109] The same is true of a coerced vote.[110] Because the injuries *Unocal* is designed to prevent elude valuation, they cannot inform a stockholder vote on the economic merits of a transaction.

And so, in my view, a careful reading of *Corwin* precludes its ability to restore the business judgment rule to claims seeking enhanced scrutiny to support injunctive relief. Defendants disagree. They rely on two Delaware Supreme Court ratification

---

[108] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002) ("This court has recognized that irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information."). There are times that our Court will provide monetary damages for disclosure violations, though recognizing that precisely quantifying the harm can be impossible. *See Mindbody*, 2023 WL 2518149, at *47 ("Here, as in *Weinberger*, the Company's stockholders were harmed by the inadequate disclosures, which deprived them of a fair opportunity to vote down the Merger. As in *Weinberger*, the precise extent of the harm cannot be established.").

[109] *Corwin*, 125 A.3d at 306 (holding the business judgment rule applies when a merger "has been approved by a fully informed, uncoerced majority of the disinterested stockholders"); *Morrison*, 191 A.3d at 275 (declining to apply *Corwin* because the defendants failed to show that the vote was fully informed).

[110] *Corwin*, 125 A.3d at 306 (requiring absence of coercion for stockholder cleansing to take effect); *Pure Res.*, 808 A.2d at 452 ("[T]he possibility that structural coercion will taint the tendering process also gives rise, in my view, to injury sufficient to support an injunction.").

cases from nearly thirty years ago, *Stroud v. Grace*[111] and *Williams v. Geier*;[112] the parties join issue on what they mean today. As Vice Chancellor Laster pointed out in a 2014 article, both support the view that a stockholder vote can lower the standard of review for enjoining defensive measures from enhanced scrutiny to the business judgment rule, because the vote interjects a second, nonconflicted decisionmaker to whom deference should be afforded.[113]

In *Stroud*, the allegedly defensive measures took the form of charter and bylaw amendments affecting nomination procedures that stockholders approved at the annual meeting.[114] The plaintiffs challenged those amendments, asserting their approval and recommendation constituted a breach of fiduciary duty and warranted review under *Unocal*.[115] The Delaware Supreme Court described *Unocal*'s full range, and stated that its underlying principles operate only "in the absence of an informed shareholder vote ratifying the challenged action," noting that the amendments at issue were ratified.[116] The Court also reasoned that "[a]ny defensive effects of the [challenged actions] were collateral at best," and concluded that

---

[111] 606 A.2d 75 (Del. 1995).

[112] 671 A.2d 1368 (Del. 1996).

[113] Laster, *supra* note 93, at 1465–68.

[114] *Stroud*, 606 A.2d at 80–81.

[115] *Id.* at 81–82.

[116] *Id.* at 81–83.

*Unocal* did not apply at all due to the absence of any threat to the board's control.[117]

The Delaware Supreme Court concluded the business judgment rule governed in the absence of misleading disclosures or other wrongdoing that was not ratified.[118]

The next year, a majority of the Delaware Supreme Court in *Williams* concluded a challenge to invalidate an allegedly entrenching charter amendment that instilled tenure voting did not "implicate[]" *Unocal* because "the Board action was not unilateral"—there was an informed and uncoerced stockholder vote.[119] According to *Williams*, "[a] *Unocal* analysis should be used only when a board unilaterally (*i.e.*, without stockholder approval) adopts defensive measures in reaction to a perceived threat."[120]  *Williams* concluded, "The instant case does not involve either unilateral director action in the face of a claimed threat or an act of disenfranchisement. . . .  Thus, neither *Blasius* nor *Unocal* applies."[121]

---

[117] *Id.* at 83.

[118] *Id.* at 83–84.

[119] *Williams*, 671 A.2d at 1376.  Under the tenure voting at issue in *Williams*, "holders of common stock on the record date would receive ten votes per share," but "[u]pon sale or other transfer . . . each share would revert to one-vote-per-share status until that share is held by its owner for three years."  *Id.* at 1370.

[120] *Id.* at 1377 (citing *Unocal*, 943 A.2d at 954–55).  I read *Williams* to reason that *Unocal*'s recognition of the omnipresent specter of a conflict between a board and its stockholders tacitly relies on an assumption that the stockholders have not themselves spoken in favor of the board's decision.  *See id.* at 1377 n.18.

[121] *Id.* at 1377.

*Stroud* and *Williams* are inconsistent with my reading of *Corwin*, and, unlike

*Santa Fe*, neither was acknowledged in relevant part by the *Corwin* Court. *Corwin*

cites *Stroud* as an example of a vote required by statute or charter that affected the

standard of review, indicating the Supreme Court thought the *Stroud* vote properly

had that effect.[122] *Corwin* also cites *Williams*, albeit for the pedestrian principle that

a vote will not have a cleansing effect if it is coerced and for the general principle

that an informed statutory vote is "the highest and best form of corporate

democracy."[123] *Corwin* did not explicitly resolve the apparent tension between

*Santa Fe* on one hand, and *Stroud* and *Williams* on the other.[124]

I believe I am duty-bound to follow the most recent and specific Delaware

Supreme Court authority. Notwithstanding *Stroud* and *Williams*, I read *Corwin*'s

plain text as reiterated in *Morrison v. Berry*, together with *Santa Fe*'s instructions

---

[122] *Corwin*, 125 A.3d at 310 n.19.

[123] *Id.* at 312 nn.27–28 (internal quotation marks omitted) (quoting *Williams*, 671 A.2d at 1381).

[124] At least one decision has described some tension as between aspects of *Corwin* and *Santa Fe*. *See Paramount Gold & Silver*, 2017 WL 1372659, at *6 ("I need not address the apparent tension between *Corwin* and *Santa Fe* . . . ."); *see also* Korsmo, *supra* note 63, at 101–02 ("This problem is at the heart of the Delaware Supreme Court's decision in *Santa Fe*, which the *Corwin* court declined to confront. As the *Santa Fe* court emphasized, a vote in favor of the merger was not a vote in favor of the defensive measures being challenged. The stockholders were not, and could not, be offered that choice. They were 'merely offered a choice between the [Board's favored] Merger and doing nothing.' Under *Corwin*, however, the stockholder vote provides omnibus absolution, and any defensive measures and side-payments are ratified along with everything else." (alteration in original) (footnotes omitted) (quoting *In re Santa Fe*, 669 A.2d at 68)).

that *Corwin* implicitly preserved, to take a claim to enjoin defensive measures under *Unocal* enhanced scrutiny out of *Corwin*'s reach. I read that to compel the conclusion that a claim for injunctive relief under *Unocal* enhanced scrutiny is not susceptible to restoration of the business judgment rule under *Corwin*. *Corwin* applies to actions seeking post-closing damages, but not to the requests to enjoin defensive or entrenching measures for which *Unocal* was designed.[125]

### 3. Plaintiffs Seek Only Injunctive Relief Under *Unocal* Enhanced Scrutiny: *Corwin* Cleansing Is Not Available.

Plaintiffs here seek enhanced scrutiny for their claim under *Unocal*, and that claim seeks only injunctive relief. They seek enhanced scrutiny under *Unocal* as evolved in the activist era. Their claim to enjoin post-close defensive measures falls in a no-man's-land between the area *Corwin* plainly cannot reach (pre-close requests for injunctive relief) and the area it plainly does (post-close damages actions).[126] And while *Santa Fe* offers guidance, it is not on all fours: here, the defensive measures at issue did not pressure the vote and "work[] their effect before the stockholders had a chance to vote," but rather were enacted by the vote, to work their effect for years to come.[127] As pled, this case still falls squarely within the purpose

---

[125] *See Corwin*, 125 A.3d at 312–14; *see also Armstrong*, 2017 WL 2062902, at *9 (describing difficulty of applying *Unocal* to post-closing damages claims).

[126] *Corwin*, 125 A.3d at 312–14.

[127] *Santa Fe*, 669 A.2d at 68. Additionally, according to Defendants, the Challenged Provisions were disclosed to and voted on by the stockholders as an integral and uncoerced

of *Unocal*: Plaintiffs seek to enjoin defensive measures on the grounds that the directors unreasonably enacted them to fend off activists.[128] Plaintiffs do not seek damages for the effect of defensive measures on a sale price, for which *Unocal* is an awkward fit:[129] they seek to enjoin those measures, for which *Unocal* was built.[130] *Corwin* promised not to interfere with *Unocal* or to "expose stockholders to unfair action by directors without protection."[131] Plaintiffs seek to enjoin an enduring entrenchment device and are not seeking monetary damages: *Corwin* is inapplicable.

---

part of the vote on the stock issuance, which if true would move this case further from the facts of *Santa Fe*.

[128] *See supra* Section II.A.1.

[129] *Armstrong*, 2017 WL 2062902, at *7–9.

[130] *See supra* Section II.A.1.

[131] *Corwin*, 125 A.3d at 312.

## D. Plaintiffs Have Pled that *Unocal* Governs Their Claim.

Having concluded that *Corwin* does not impose a presumption of the business judgment rule, I turn to whether the claims as pled inspire enhanced scrutiny. In all situations other than the enactment of a rights plan, triggering *Unocal* enhanced scrutiny requires pleading the board acted with a subjective motivation of defending against a perceived threat.[132] In other words, the plaintiff must plead facts to support a reasonable inference that the "board 'perceive[d] a threat' to corporate control and took defensive measures in response."[133] The Court may consider all relevant

---

[132] *See Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009) (stating that for *Unocal* to apply, a complaint must plead facts "from which it could reasonably be inferred that the defendants acted 'defensively'"); *Santa Fe*, 669 A.2d at 71 ("Enhanced judicial scrutiny under *Unocal* applies 'whenever the record reflects that a board of directors took defensive measures in response to a "perceived threat to corporate policy and effectiveness which touches upon issues of control."'" (quoting *Unitrin*, 651 A.2d at 1372 n.9); *In re Ebix, Inc. S'holder Litig.*, 2016 WL 208402, at *18 (Del. Ch. Jan. 15, 2016) ("[Where] a complaint pleads nonconclusory facts sufficient to support the characterization of a given board's action as defensive, the burden shifts to the board to prove the reasonableness that action."); *see also Williams Cos. S'holder Litig.*, 2021 WL 754593, at *23 ("The Director Defendants' actual and articulated reason for taking action figures prominently in the *Unocal* analysis."); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 599–600 (Del. Ch. 2010) ("[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends."). Rights plans are an exception to this rule, as their entrenching effects are so severe that this Court will review it under *Unocal* regardless of the board's subjective motivation. *Selectica*, 5 A.3d at 599; *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *21 (citing *Selectica*, 5 A.3d at 599).

[133] *Stroud*, 606 A.2d at 82; *Armstrong*, 2017 WL 2062902, at *7 (citing *Stroud*, 606 A.2d at 82) (same); *see also Ebix*, 2016 WL 208402, at *19 (considering *Goggin v. Vermillion, Inc.*, 2011 WL 2347704 (Del. Ch. June 3, 2011), then *Kahn v. Roberts*, 679 A.2d 460 (Del. 1996), and then *Doskocil Cos. Inc. v. Griggy*, 1988 WL 85491 (Del. Ch. Aug. 18, 1988)).

circumstances to discern the directors' motivations.[134]  This inquiry is subjective, pragmatic, and context-specific, and the Court will look to all relevant facts.  For example, in inferring whether a board acted with the requisite intent, our courts have considered the timing of the allegedly defensive actions[135] and whether those measures have a potentially entrenching or defensive effect,[136] whether there was a looming threat of a proxy contest,[137] whether the allegedly defensive actions were

---

[134] *See Ebix*, 2016 WL 208402, at \*18–20.

[135] *Griggy*, 1988 WL 85491, at \*6 (reasoning "[t]he adoption of a Rights Plan within a few weeks after the Schedule 13Ds were filed and the Smith Barney engagement letter strongly suggest that the defendant directors were operating in a defensive mode"); *Henley Gp., Inc. v. Santa Fe S. Pac. Corp.*, 1988 WL 23945, at \*13 (Del. Ch. Mar. 11, 1988) ("[T]he PIK debenture component of the restructuring first originated as a concept in December, 1987. In fact, the Board approved the restructuring, including the PIK debentures, on December 8, 1987—the very day it also adopted a package of antitakeover measures, including the reduction of the Rights Plan trigger to 20%.").

[136] *Ebix*, 2016 WL 208402, at \*19 (considering the threat of proxy contest, the timing of allegedly defensive provisions in relation to the announcement of the proxy contest, and the defensive effects of the provisions at issue); *Henley Gp.*, 1988 WL 23945, at \*13 (concluding the approval of a payment-in-kind debenture was defensive in part because "the debentures have an indisputable (though limited) antitakeover effect" and "the PIK restrictions would make [the company] less attractive to certain prospective acquirers"); *Kidsco Inc. v. Dinsmore*, 674 A.2d 483, 493 (Del. Ch.), *aff'd and remanded*, 670 A.2d 1338 (Del. 1995) ("In neither case would the amendment perpetuate the current board in office.").

[137] *Gantler*, 965 A.2d at 705 ("Count I does not allege any hostile takeover attempt or similar threatened external action from which it could reasonably be inferred that the defendants acted 'defensively.'"); *Roberts*, 679 A.2d at 466 ("Here the corporation sought to repurchase its own shares in a situation where there was no hostile bidder.  Nothing in the record indicates that there was a real probability of any hostile acquiror emerging or that the corporation was 'in play.'" (footnote omitted)).

otherwise necessary to accomplish a legitimate goal,[138] whether the defendants requested the provision or provisions at issue,[139] and whether there was a clear alternative reason for acting.[140]

Plaintiffs do not directly plead that the Board perceived a threat and then responded defensively. Rather, Plaintiffs ask the Court to infer a subjective entrenchment motivation from financial difficulty or underperformance, online commentary that the company could be a target for activists, and the execution of the Challenged Provisions several months later. They also argue that "the objective provisions of the Stockholders' Agreement alone support such a reasonable inference at this stage."[141]

I begin by considering whether the Challenged Provisions have a defensive effect: if they do not, it would be difficult to conclude the Board negotiated them in response to a perceived threat.[142] Upon the Acquisition, College Parent holds

---

[138] *Henley Gp.*, 1988 WL 23945, at *13 ("[T]he restructuring could have been accomplished without the PIK debentures: the entire $30 per share dividend could have been paid as cash, and the $5 per share PIK debenture component could have been conventionally financed on less stringent terms.").

[139] *Griggy*, 1988 WL 85491, at *6 ("Moreover, the defendant directors neither asked for nor wanted the put provision.").

[140] *Roberts*, 679 A.2d at 466 ("Furthermore, the board acted to remove disgruntled shareholders, not in contemplation of an ephemeral threat that could somehow materialize at some point in the future." (citation omitted)).

[141] D.I. 29 at 35.

[142] *See, e.g.*, *Stroud*, 606 A.2d at 83 (rejecting argument that the board approved and recommended various director-nomination bylaw amendments in response to their

41

approximately 35% of the Company's outstanding shares and is required to attend every meeting by person or proxy and vote those shares in favor of the Board's nominees.[143] The guaranteed support of 35% of the outstanding shares tends to prevent an incumbent director from losing an election, or at the very least make it far less likely.[144] The Director Voting Requirement can also deter an activist from launching a proxy contest, if only to extract other concessions; a proxy contest is markedly more difficult if the board has the guaranteed support of 35% of the vote.[145] The other Challenged Provisions have less significant defensive effects. The Transfer Restrictions prevent College Parent from selling a large block of shares at one time to anyone at all for two years, and then specifically to top activists for a third year. This closes off an easy route for an activist to target the Company. Likewise, the Vote Neutralization Provision precludes outright opposition from a

---

controllers' control where the controllers already held a majority of the company's outstanding shares).

[143] S'holders' Agr. § 3.1.

[144] *See Voigt v. Metcalf*, 2020 WL 614999, at *18–19 (Del. Ch. Feb. 10, 2020).

[145] *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *30 ("[A]ctivists' ability to replace directors through the stockholder franchise is the reason why boards listen to activists. Most activists hold far less than a hard majority of a corporation's stock, making the main lever at an activist's disposal a proxy fight."); Kahan & Rock, *supra* note 66, at 970 & n.6 (explaining that activists are often successful in securing board representation or having a target adopt their proposals, and stating that "[a]ctivists often secure board seats with only the explicit or implicit threat of a proxy fight, without even filing any proxy materials"); *see Voigt*, 2020 WL 614999, at *18–19 (analyzing impact of 35% blocholder in contested director elections).

35% blocholder on any nonroutine matters, which tends to stifle opposition to corporate policy. The Challenged Provisions have defensive effects, both when viewed together and separately.[146]

But "[a] corporate action with collateral effects including a tendency to preserve incumbent control is not per se subject to *Unocal* scrutiny."[147] *Unocal* enhanced scrutiny still requires a subjective motivation to act defensively in response to a perceived threat.[148] The Complaint pleads that in the years leading up

---

[146] Defendants argue that the Challenged Provisions could not have a defensive effect because the Company has a classified board and certain of its directors will not be up for reelection until 2025, "by which point the Individual Defendants may not be renominated or even want to continue to serve." D.I. 25 at 25. The irony of this argument is not lost on the Court. *See Airgas, Inc. v. Air Prods. & Chems., Inc.*, 2010 WL 3960599, at *2 (Del. Ch. Oct. 8, 2010) (referring to a classified board as a "standard defense[]"), *rev'd on other grounds*, 8 A.3d 1182 (Del. 2010). And while it is correct that all the incumbent directors will not stand for reelection until 2025, the incumbent directors control only six of the nine Board seats, meaning that with College Parent's two Board seats, the activist would need only two seats before the Defendant Directors were a minority. And if the incumbent directors lose majority Board control, they lose control of College Parent—College Parent is required only to vote with the Board's recommendations, and so the loss of these seats would mean that the incumbent directors would lose control over College Parent's votes. The Challenged Provisions still tend to entrench even the classified board. And the presence of a classified board has historically not precluded the application of *Unocal*. *See, e.g.*, *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48 (Del. Ch. 2011).

[147] *Ebix*, 2016 WL 208402, at *18; *see also Stroud*, 606 A.2d at 83 (declining to apply *Unocal* because "[a]ny defensive effects of the [general option agreement] and the Amendments themselves were collateral at best.").

[148] *See Unocal*, 493 A.2d at 955 ("In the face of this inherent conflict directors must show that they had reasonable grounds *for believing* that a danger to corporate policy and effectiveness existed because of another person's stock ownership." (emphasis added)); *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *23 ("The Director Defendants' actual and articulated reason for taking action figures prominently in the *Unocal* analysis.").

43

to the Acquisition, the Company's stock price suffered a dramatic decline, and its Board and management appeared to be struggling to pull off a turnaround plan. Analysts were speculating that the Company was likely an activist target:[149] activists often target companies that have depressed stock prices or are otherwise underperforming.[150] The Company's troubles persisted, and the Board negotiated for the Challenged Provisions only one month after lowering its third quarter earnings guidance in November 2021. On January 20, 2022, at least one analyst was expressing skepticism that the Company could execute on its turnaround plan.[151] The Company proceeded with the Acquisition, announcing the transaction in March of 2022. At this time, the Company appeared to remain a potential activist target, as following the announcement, *The Deal* observed that "Apollo could serve as a white squire if activists pursue Limelight."[152] The parties closed the Acquisition in June 2022, entering into an agreement including the Challenged Provisions.

---

[149] While it is true that the Complaint does not plead the Director Defendants were aware of the specific market commentary speculating activists may target the Company, it is reasonable to infer that as directors of a publicly traded company covered by analysts, they were aware of what those analysts were writing. Additionally, it is reasonable to infer that the Defendant Directors were aware that the Company's financial performance could make it vulnerable to activists.

[150] *See supra* note 71.

[151] Compl. ¶ 34.

[152] *Id.* ¶ 49.

These allegations support the plaintiff-friendly inference that the directors negotiated the Challenged Provisions with the subjective motive of defending against an activist threat. The third year of the Transfer Restrictions bear a good deal of Plaintiffs' burden: the Director Defendants negotiated a provision that expressly and specifically prohibited the transfer of College Parent's stock from a list of entities likely to launch an activist campaign. The Board negotiated this restriction following the well-founded observation that the Company was an activist target, within one month of the Company lowering its earnings guidance, and after missing earnings estimates for the two previous quarters. This series of events supports the plaintiff-friendly inference that the Board was concerned with the prospect of stockholder activism and negotiated with College Parent to reduce the likelihood of activist intervention.

Thus, I find it reasonable to infer that the Board negotiated for and obtained the Challenged Provisions to defend against a perceived threat of activism. I do so cautiously. Inferring subjective defensive intent from the objective characteristics of a defensive measure is not very different than the per se trigger of *Unocal* that to date has been reserved for rights plans.[153] And the mandate to make

---

[153] *See, e.g.*, *Selectica*, 5 A.3d at 599 ("Consequently, notwithstanding its primary purpose, a NOL poison pill must also be analyzed under *Unocal* because of its effect and its direct implications for hostile takeovers."). I note that it is unlikely that the nature of the Challenged Provisions alone would be sufficient to trigger *Unocal*.

plaintiff-friendly inferences does a lot of work here, given the absence of board minutes or other internal documents more directly reflecting the Director Defendants' subjective motivations.[154] Still, I conclude *Unocal* enhanced scrutiny applies at the pleading stage. Because Defendants have not argued that the *Unocal* standard is satisfied, Plaintiffs have adequately pled this claim.

### E. Next Steps

Having concluded that Plaintiffs' claim warrants enhanced scrutiny, I pause for a moment to consider the relief sought. Plaintiffs seek certification of a class of all record and beneficial holders of Limelight stock injured by Defendants' conduct, except Defendants and their affiliates—it is unclear if the class includes College Parent.[155] According to Plaintiffs, the class is "entitled to an injunction or other appropriate declaratory/equitable relief preventing the enforcement of the Incumbent Voting Requirement, the Vote Neutralization Provision, and the . . . Transfer Restrictions."[156] Those provisions are part of a much broader agreement

---

[154] Plaintiffs chose to forgo pursuing a books and records action pursuant to 8 *Del. C.* § 220 before filing a complaint in this action. Had Plaintiffs done so, they may have been able to plead additional facts evincing the Director Defendants' motivations for acting. *See, e.g.*, *Lockton v. Rogers*, 2022 WL 604011, at *16 n.244 (Del. Ch. Mar. 1, 2022) ("I note that records available under Section 220, resort to which the Plaintiffs eschewed, would presumably have disclosed any participation of Graham in the Merger sufficient to bolster the implication of knowing participation in breaches of duty.").

[155] Compl. ¶¶ 68, 71.

[156] *Id.* ¶ 82; *see also id.* at Prayer For Relief.

between the Company and College Parent to effectuate the Acquisition. And while College Parent may be a putative member of the class, which raises its own issues, it is yet not a party to this matter as it seems it should be if terms in a contract it executed are in jeopardy.[157] As the case develops, I ask the parties to confer and advise the Court as to whether Plaintiffs seek an injunction against the enforcement of the Challenged Provisions if College Parent were to breach them, or something broader; whether College Parent should be a party to this matter; and whether College Parent is properly part of the putative class. If the requested injunction is to "prevent[] the enforcement of the" Challenged Provisions in the event of a breach,[158] I would also ask the parties to consider the jurisdictional issue of ripeness.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion is **DENIED.**

---

[157] *See Germaninvestments AG v. Allomet Corp.*, 2020 WL 6870459, at *8 (Del. Ch. Nov. 20, 2020) ("Delaware decisions recognize that when litigation places at issue the validity or enforceability of property rights, such as a party's rights under an agreement, then the holders of the property rights have an interest in the subject matter of the action such that they should be joined as parties." (internal quotation marks omitted) (quoting *Perry v. Neupert*, 2017 WL 6033498, at *12 (Del. Ch. Dec. 6, 2017))), *aff'd in part, rev'd in part on other grounds*, 225 A.3d 315 (Del. 2020); *Elster v. Am. Airlines*, 106 A.2d 202, 204 (Del. Ch. 1954) ("All parties to a contract sought to be cancelled are indispensable parties to the suit for cancellation unless it is obvious that one not joined has no interest whatever in the subject matter of the suit.").

[158] Compl. ¶ 82.